578 P.2d 1074

C. A. CARPENTER, Plaintiff-Appellant,

v.

PAYETTE VALLEY COOPERATIVE, INC., a corporation, Defendant-Respondent.

No. 11850.

Supreme Court of Idaho.

April 28, 1978.

Peter J. Boyd, James D. LaRue and Phillip M. Barber, of Elam, Burke, Jeppesen, Evans & Boyd, Boise, for plaintiff-appellant.

Louis Gorrono, Emmett, for defendant-respondent.

BISTLINE, Justice.

On this appeal, we affirm a trial court decision denying any relief to appellant Carpenter on his action to collect the unpaid principal and interest on a promissory note alleged to have been guaranteed by respondent Payette Valley Cooperative, Inc. (the Co-op).

Distilled to its essence, the transaction involved a loan of $20,000.00 from Carpenter to a dairy farmer, Browne, in return for a $29,180.40 promissory note payable at $242.57 monthly. The loan was engineered by Collinsworth, the manager of the Co-op, who apparently thought the transaction would benefit Carpenter, stabilize the faltering farming operation of Browne, and further the Co-op's business. In no way does it appear that Collinsworth himself gained from the transaction, the unfortunate outcome of which was to cause him to lose his position with the Co-op after 19 years of employment, and Carpenter to lose all his investment. Browne was apparently destined to lose in any event.

Collinsworth thought to aid Browne, who was a member of the Co-op, and indebted to it on an open account in the amount of $11,932.87. Collinsworth apparently believed that Browne's dairy operation would improve by adding some cows to his herd.

Carpenter advanced the loan by handing Collinsworth a $20,000.00 cashier's check dated August 4, 1970, which Collinsworth

testified was deposited in the Co-op bank account. The signatures of Mr. and Mrs. Browne as makers were affixed to the note[1] at the same time, and Collinsworth purported to sign for the Co-op in this manner:

Endorsement

Pay to the Order of Mr. or Mrs. C. A. Carpenter With full Recourse,

|  |  |  |
|---|---|---|
|  | Endorser | Payette Valley Cooperative, Inc. |
| Date August 4, 1970 | By | s/ Elwood Collinsworth |
|  | Title | Manager |

At about the same time, Browne's open account was credited with a payment of $6,953.65. Browne bought the cows. Collinsworth testified that there would be a $13,000.00 check to show that payment. At the making of the loan, Carpenter was given an assignment of Browne's monthly dairy checks in the amount of monthly note payments, which assignment Carpenter voluntarily released in October, 1971.

When Browne's operation failed, Collinsworth made a clean breast of the entire matter to his Board. The Co-op immediately disavowed the transaction by letter of its attorney to Carpenter on January 13, 1972, denying any previous knowledge thereof and denying any liability by reason of the unauthorized alleged "guaranty."

At the trial which ensued, Board members testified that they had no knowledge of the transaction whatever until informed of it by the manager as aforesaid. The Co-op's auditor testified similarly. As manager, Collinsworth had been given specific authority to bind the Co-op in financial transactions with two specific banks and one credit concern. He admitted knowing that his authority in that vein did not extend to dealing with individuals.[2] Neither Collinsworth nor Carpenter ever advised the Co-op directors or its auditor of the transaction. Carpenter was induced to make the loan on the strength of the good interest yield for the use of his money. The trial court found that Carpenter, engaged in the banking business, was well acquainted with interest rates and with the requirement of a corporate resolution conferring guaranty authority on managers of business firms such as the Co-op.

I.

The trial court properly observed that the note is not a negotiable instrument, since it is not made payable to order or to bearer as required by I.C. § 28–3–104(1)(d).[3] However, it does *not* follow that the note falls outside the Uniform Commercial Code. Article 3 of the Code deals with *all* "Commercial Paper," not just that which is negotiable. The same section which defines "negotiable instrument," goes on to state:

As used in other chapters of this act, and as the context may require, the terms

1. The parties used a printed form of note which appears to be the type utilized by retailers in the financing of equipment and other personal property. Although the form contained a standard guaranty with lines for signature, the guaranty provision was not used. It would seem that the place where Collinsworth signed was designed to facilitate a transfer of the note to a finance company. However, throughout the trial Carpenter contended that the note was in fact "guaranteed," while the Co-op took the position that the endorsement amounted to that of "an accommodation maker." The "endorsement," assuming its validity, placed the Co-op in the position of transferring to the Carpenters the note on which Carpenters were the original and only payees.

2. See finding 19 and conclusions 3, 5, 8 and 15 in text of opinion.

3. I.C. § 28–3–104:
   (1) Any writing to be a negotiable instrument within this chapter must
   (a) be signed by the maker or drawer; and
   (b) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this chapter; and
   (c) be payable on demand or at a definite time; and
   (d) be payable to order or to bearer.

"draft," "check," "certificate of deposit" and "note" may refer to instruments which are not negotiable within this chapter as well as to instruments which are so negotiable. I.C. § 28–3–104(3) Furthermore, I.C. § 28–3–805 deals with the precise problem of a note such as that involved in this case:

*Instruments not payable to order or to bearer.*—This chapter applies to any instrument whose terms do not preclude transfer and which is otherwise negotiable within this chapter but which is not payable to order or to bearer, except that there can be no holder in due course of such an instrument.

The note before us meets the above definition: its terms do not preclude transfer and, except for the fact that it is not made payable to order or to bearer, it is otherwise negotiable.

The trial court, without resort to the U.C.C., reached the conclusion that no liability could attach to the Co-op by reason of the endorsement of the note by Collinsworth because he was at all times acting beyond the scope of his employment and without the knowledge, consent or authority of the Co-op directors. The trial court made specific findings in this regard:

6. The loan money of $20,000.00 was made by check payable to the Defendant and deposited, by Elwood Collinsworth, on August 6, 1970, at the Bank of Idaho, New Plymouth, Idaho.

.　　.　　.　　.　　.

9. All of the negotiations for, execution of, distribution and deposit of said loan monies were without authority, consent or knowledge of the Board of Directors of the Defendant Cooperative.

10. Elwood Collinsworth at all times pertinent to the negotiation, execution and delivery of said note, and the use of any proceeds of the loan, was acting outside the scope of his employment and without authority or consent of the Defendant and its Board of Directors.

.　　.　　.　　.　　.

13. The Board of Directors exercised control of their manager, Elwood Collins-worth, in Cooperative business involving financial matters, in that he was duly authorized by resolution or minute to conduct financial business with certain designated financial institutions. The designated or approved financial institutions did not include the Plaintiff nor the Intermountain State Bank at Horseshoe Bend, Idaho, where Plaintiff was employed.

14. Elwood Collinsworth was not at any time authorized by the Defendant, to endorse the promissory note held by the Plaintiff.

15. The Board of Directors of the Defendant Cooperative did not at any time ratify, confirm, nor approve of the endorsement of Elwood Collinsworth to the said promissory note.

16. The Board of Directors of the Defendant did not, at any time, knowingly receive benefits, if any, from the said Jack Browne note.

17. Bernard Newman, C.P.A., and the accountant who specializes in audits of Cooperatives, completed audits of the Cooperative in 1970 and 1971. He did not discover and did not have any knowledge of the Jack Browne note and the endorsement of Elwood Collinsworth until after the 2nd day of January, 1972, when Elwood Collinsworth confessed to certain members of the Board of Directors of the Cooperative that he had withheld information from them and that he had endorsed the Jack Browne note. The auditor had made due inquiry of Elwood Collinsworth, as standard audit procedure, whether there were any contingent liabilities, other than those shown on the records, and the auditor was not informed by Elwood Collinsworth of the Browne-Carpenter note. The auditor was contacted about the 8th day of January, 1972, to make a new or amended audit to reflect the circumstances of the Jack Browne note in light of the confession of Elwood Collinsworth. The Board at all times timely denied any knowledge or liability in connection with the said note and endorsement.

.　　.　　.　　.　　.

19. The Defendant had not apparently, ostensibly or otherwise, held out Elwood Collinsworth, their manager, as having authority to endorse a promissory note or like paper except with the P.C.A., Bank of Idaho, and the Spokane Bank of Cooperatives. The Defendant and its Board of Directors are not estopped from showing Elwood Collinsworth had no authority, real, implied or apparent, to endorse said note, as manager of the Defendant Cooperative.

Conclusions of law similar to findings above set forth were also made by the trial court:

3. Elwood Collinsworth, at all times pertinent to the negotiation, execution and delivery of the C.A. Carpenter note and the use of any proceeds of the loan, was acting outside the scope of his employment as the Manager of the Payette Valley Cooperative and also without authority, knowledge or consent of the Defendant and its Board of Directors.

.      .      .      .      .

5. The Defendant and its Board of Directors did not at any time pertinent hereto clothe the manager, Elwood Collinsworth, with apparent, implied or ostensible authority to endorse commercial paper outside of those financial transactions with authorized institutions which did not include C.A. Carpenter or the Intermountain State Bank.

.      .      .      .      .

8. The Board of Directors of the Defendant Cooperative exercised control over their manager, Elwood Collinsworth, in business of the Cooperative involving financial matters, in that he was duly authorized by resolution and minutes to conduct financial business with certain designated financial institutions. The designated financial institutions did not by implication or otherwise include the Intermountain State Bank at Horseshoe Bend, Idaho, nor the manager thereof, to-wit: C.A. Carpenter, acting in a personal capacity.

.      .      .      .      .

15. There was not sufficient proof, if any, that C. A. Carpenter had knowledge of the past acts and behavior of Elwood Collinsworth, in the course of his employment, as manager of the Defendant Cooperative, or that C. A. Carpenter relied on any such acts and behavior, in making the loan to Jack R. Browne and Irene H. Browne, with the endorsement of Elwood Collinsworth as said manager.

Findings No. 15 and No. 16 were also entered by the trial court as conclusions of law, Nos. 10 and 11. As findings and conclusions, such constitute an ultimate holding of the trial court on the issues of ratification and retention of benefits, and it is such holding only that constitutes Carpenter's challenge on this appeal—on the theory of "ratification en toto" which is fully discussed further on in this opinion.

In effect, the trial court was holding that Collinsworth's signature was unauthorized, a possibility contemplated by the U.C.C.:

"Unauthorized" signature or indorsement means one made without actual, implied or apparent authority  .   .   :.   I.C. § 28–1–201(43)

Such finding by the trial court was thus in accord with the U.C.C. and was in keeping with long-established principles of the law of principal and agency:

The rule would seem to be that a person dealing with an agent should ascertain the extent of his authority from the principal [citations omitted];  .   .   .   and he cannot rely upon the agent's statement or assumption of authority, or upon the mere presumption of authority. [Citation omitted.] If such person makes no inquiry but chooses to rely upon the agent's statement he is chargeable with knowledge of the agent's authority, and his ignorance of its extent will be no excuse to him, and the fault cannot be thrown upon the principal who never authorized the act or contract. *Chamberlin v. Amalgamated Sugar Co.*, 42 Idaho 604, 612, 247 P. 12, 14 (1926).

This general rule admits of exceptions when, for example, the agent's apparent authority grows out of a previous course of dealing between the particular parties or is based upon well-founded expectations within a given industry:

"a corporation which, by its voluntary act, places an officer or agent in such a position or situation that persons of ordinary prudence, conversant with business usages and the nature of the particular business, are justified in assuming that he has authority to perform the act in question and deal with him upon that assumption is estopped as against such persons from denying the officer's or agent's authority." *Gore v. Richard Allen Mining Co.*, 61 Idaho 622, 627–28, 105 P.2d 735, 737 (1940).

Under the facts of the present case, as sketched above, it is clear that Carpenter cannot bring himself within any of the exceptions to the general rule. The trial court's finding that Collinsworth had neither express nor apparent authority to act as agent of the Co-op in guaranteeing the personal notes of faltering Co-op members is amply supported by the record.

## II.

■ Carpenter's main argument on appeal is not that Collinsworth had express or apparent authority at the outset but rather that the Co-op subsequently ratified the transaction. The relevant portion of the U.C.C. reads:

(1) Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it; . . .

(2) Any unauthorized signature may be ratified for all purposes of this chapter. I.C. § 28–3–404

"Ratification," though not defined by the U.C.C., has long been recognized as another method (in addition to actual, implied and apparent authority) whereby liability of the principal for an agent's acts may be established.[4]

Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act as to some or all persons, is given effect as if originally authorized by him. Restatement of Agency 2d § 82 (1958).

Ratification of the unauthorized acts of an agent may take many forms. It may, of course, be by way of *express* affirmance of the agent's act once it becomes known. It may also be *implied* if the principal, with full knowledge of the material facts, receives, accepts and retains benefits from the contract; remains silent, acquiesces in or fails to repudiate or disaffirm the contract; or otherwise exhibits conduct demonstrating an adoption and recognition of the agent's act as binding. 2 Fletcher, Cyclopedia of the Law of Private Corporations § 752 (perm. ed. Wolf & Comisky rev. 1969). In the present case, it is clear that no *express* ratification took place: the Co-op promptly and firmly repudiated the conduct of its agent as soon as that conduct was brought to its attention. Carpenter's main argument on appeal, therefore, is that the Co-op, after learning of its agent's unauthorized act has, notwithstanding its express repudiation, "impliedly ratified" that act by retaining the benefits thereof: "one may not take the benefits of a contract made in his behalf and reject the burdens." *Blackwell v. Kercheval*, 27 Idaho 537, 546, 149 P. 1060, 1063 (1915). Carpenter points to the fact that nearly $7,000.00 of the proceeds of his loan to Browne went to pay off part of Browne's indebtedness to the Co-op and that most of the remaining $13,000.00 went to pay for Browne's additional cattle, the proceeds of which, according to Carpenter, undoubtedly served to enrich the Co-op at the time of its subsequent foreclosure.[5] For clarity of analysis, it is impor-

---

4. The Code language dealing with the situation in which a principal is "precluded from denying" an agent's signature is more limited in focus. According to the drafters, the language is carried over from the Uniform Negotiable Instruments Law in order to "recognize the possibility of an estoppel against the person whose name is signed, as where he expressly or tacitly represents to an innocent purchaser that

the signature is genuine; and to recognize the negligence which precludes a denial of the signature." I.C. § 28–3–404, Comment 4.

5. It has been observed that, under such circumstances, an "implied ratification" is not a ratification at all. Unlike a true ratification, it does not depend upon the intent of the principal. Rather, it is a case in which the principal is

tant to handle these two transactions separately.

### A.

Carpenter points out that on the very day he loaned the money to Browne by presenting Collinsworth with a $20,000.00 cashier's check payable to the Co-op, Browne's open account at the Co-op was credited with a payment of $6,953.55. Carpenter insists that the Co-op, once it learned of its agent's conduct, was put to a choice: either repudiate the transaction and return the proceeds still in its possession, or affirm the transaction and stand behind its agent's unauthorized "guaranty." He relies upon the general rule of "ratification *in toto*": a principal must either ratify the whole transaction or repudiate the whole; he cannot ratify the part that is beneficial to him and repudiate the remainder. 2 Fletcher, Cyclopedia of the Law of Private Corporations § 773, *supra*. Had Collinsworth borrowed money *on behalf of the Co-op*, the outcome would be clear. No court of equity would permit the Co-op to pocket the proceeds while claiming to repudiate the unauthorized conduct of its agent.

That, however, is not the case at bar. Here, Collinsworth guaranteed repayment of a loan made to *Browne*, a portion of whose borrowed loan proceeds then went to pay off part of Browne's pre-existing debt to the Co-op. The precise question thus becomes: Can an experienced banker (Carpenter) who loaned money on the strength of an agent's (Collinsworth's) unauthorized "guaranty," recover from the principal (the Co-op) the proceeds of his loan to the extent that they were used as a credit against the borrower's (Browne's) prior indebtedness to the principal?

Neither party has provided us with any authority dealing with this precise question. We take our bearings from the Restatement of Agency 2d § 98 which states the law governing such situations:

Receipt of Benefits as Affirmance.

The receipt by a purported principal, with knowledge of the facts, *of something to which he would not be entitled unless an act purported to be done for him were affirmed, and to which he makes no claim except through such act*, constitutes an affirmance unless at the time of such receipt he repudiates the act. If he repudiates the act, his receipt of benefits constitutes an affirmance at the election of the other party to the transaction. (Emphasis supplied.)

The crucial consideration, therefore, is whether or not the principal who has received the "benefits," has a claim to them independently of his agent's unauthorized transaction.

In Idaho, the case which most clearly addresses this question is *T. W. & L. O. Naylor Co. v. Bowman*, 39 Idaho 764, 230 P. 347 (1924). The Naylor Company was a car dealership which sold an automobile to Emmett Poole. Title was to remain in the dealer pending full payment. Thereafter, Bowman purchased the car from Poole and, according to both Bowman and Poole, an agreement was reached with Naylor's agent Stowell whereby the title would be released to Bowman upon payment of the sum of $600.00, which sum did not constitute full value for the car. Judgment was entered upon a jury verdict awarding the car to Bowman but this Court reversed on the appeal.

The Court noted, first of all, that in the normal course of business, it was not to be expected that the agent, Stowell, would have the power to release title at all, much less in the absence of full payment of the purchase price. In words equally appropriate to the case at bar, the Court remarked that such an act was not

usual or natural but on the contrary is an unusual and unnatural act in the transacting of the business of the principal, and is such an act as to put a third party on notice, and it has often been pointed

estopped from denying the unauthorized act of his agent because to do so would result in the unjust enrichment of the principal. A court of equity will not tolerate such a result and has in its arsenal any number of weapons to prevent

it: equitable estoppel, waiver, implied ratification, constructive trust, etc. *See*, for example, *Davenport v. Burke*, 30 Idaho 599, 167 P. 481 (1917).

out that the only logical inference to be drawn from such acts on the part of the agent is that he is acting beyond and in excess of his authority. *T. W. & L. O. Naylor Co. v. Bowman*, 39 Idaho at 768, 230 P. at 348.

Having thus rejected Bowman's argument based upon Stowell's actual or apparent authority to transfer title on behalf of appellant Naylor Company, the Court turned to Bowman's argument based upon subsequent ratification. Bowman argued that the Naylor Company, by accepting his check for $600.00, retained the benefit of, and therefore must be held to have ratified, the agreement of its agent. As in the present case, the Court had no trouble accepting Bowman's position as a correct abstract statement of the applicable law:

> The rule would seem to be that a principal may ratify the unauthorized act of his agent if, at the time of such ratification he has knowledge of all the material facts connected with the transaction and the ratification may be either by words or by conduct indicating an intention on the part of the principal to adopt the act as his own, and such intention may be implied from an acceptance of the benefits of the unauthorized act. *Id.* at 768–79, 230 P. at 348.

As here, however, the statement of the general rule was held not to be dispositive without further inquiry. Even assuming that whatever deal was made was beyond the authority of Naylor's agent, the "benefits" accruing to Naylor might still admit to two different characterizations: on the one hand, it might be that the $600.00 payment was part performance and thus entitled Bowman to receive title to the car; on the other hand, it might only be payment by Bowman for the delinquent account of his friend Poole. If the latter was the case, then the money was owed independently to Naylor and need not be returned simply because it was the result of an agent's unauthorized agreement:

> If it [the $600.00] was paid as part performance of a contract which Stowell made with respondent [Bowman], by the terms of which the title to the car should be released, appellant [Naylor Company]

could not keep the money and repudiate the contract. On the other hand, if it was not paid as part performance of such a contract, but simply for the purpose of taking up the dishonored check which Poole had given, the retention of the check by appellant would not constitute a ratification of such a contract. *Id.* at 769, 230 P. at 348.

The *Naylor* case thus stands for the proposition that a principal cannot be said to have "ratified" the unauthorized acts of its agents simply by holding on to the benefits of that transaction if the principal has a claim to those benefits independently of the unauthorized transaction. Or, as this Court has held in more recent years, a party who claims to have benefited a principal by reason of the unauthorized action of an agent has the burden of proving that the benefits accrue *directly* to the principal as the *proximate result* of the unauthorized transaction in order to constitute ratification by the principal. (Emphasis supplied.) *Killinger v. Iest*, 91 Idaho 571, 576, 428 P.2d 490, 495 (1967).

Carpenter has made no such showing in the present case. The Co-op was not a party to the loan transaction and the unauthorized "guaranty" of its agent fails to obligate it in any way. Browne was its debtor and the $6,953.65 payment out of the loan proceeds was made on Browne's debt to the Co-op. What Carpenter fails to recognize is that *the Co-op realized nothing to which it was not entitled.* It had the right to receive money which it was owed and which was paid to it. Because it has an independent claim to the money, it cannot be said to have acted inconsistently by retaining it while repudiating the unauthorized act of its agent. *See also, Linn v. Alameda Mining & Milling Co.*, 17 Idaho 45, 104 P. 668 (1909); *Gandy v. Cole*, 35 Mich.App. 695, 193 N.W.2d 58 (1971).

B.

■ Carpenter's contention that the Co-op has benefited from the $13,000.00 used to purchase additional cattle presents a less difficult question. Carpenter argues that

when Browne failed and the Co-op foreclosed on the chattel security in the summer of 1972, surely some of the cows which were sold must have been cows purchased with funds from Carpenter's loan advance. At trial, Carpenter failed to identify any such cows. More importantly, it is clear that Carpenter never required Browne to execute a security agreement, nor did Carpenter record a financing statement covering the cows Browne purchased with the money which he advanced to Browne. Carpenter proceeded into this transaction with the opportunity of knowing that the Co-op held a chattel mortgage on Browne's cows and equipment, which mortgage carried an after-acquired property provision. Having failed to perfect any security interest in the cows which Browne purchased with part of the loan proceeds, Carpenter had only the promissory note to look to for the return of his investment. *See Whitworth v. Krueger*, 98 Idaho 65, 558 P.2d 1026 (1976).

Judgment affirmed. Costs to respondent.

McFADDEN, DONALDSON and BAKES, JJ., concur.

SHEPARD, Chief Justice, dissenting.

For the reasons that follow, I would reverse the decision of the trial court and order a new trial.

## APPARENT AUTHORITY

The Co-Op ought to be held liable to Carpenter on the theory of apparent authority. "[A]pparent authority to do an act is created as to a third person [Carpenter] by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." Restatement (Second) of Agency § 27 (1958). The majority argues that Carpenter dealt with Collinsworth at his risk if he did not demand of Collinsworth evidence supporting the claim of authority to act as the Co-Op's manager and agent in financial affairs. *Killinger v. Iest*, 91 Idaho 571, 428 P.2d 490 (1967). It is not disputed, however, that in fact the Co-Op had given Collinsworth authority to bind

the Co-Op in financial transactions with two banks and a credit concern. Carpenter was aware of Collinsworth's prior conduct on behalf of the Co-Op in financial affairs. The proper test of whether Collinsworth had apparent authority to bind the Co-Op in a financial transaction with Carpenter is set forth in comment d to Section 27 of the Restatement. It states:

"The position of those who do not know of the prior conduct or reputation of the agent is to be distinguished from those who know of this but are not familiar with the extent of the powers of the kind of agent he appears to be. As to these the agent has apparent authority. Thus, a manager has apparent authority to do those things which managers in that business at that time and place customarily do, as to persons who know that he is a manager, although they do not know what powers managers in such a business have. In such cases the manifestation is interpreted as meaning that the agent has the powers which such managers have, and those dealing with him are entitled to rely upon this as to the extent of the agent's authority, even though they do not know the powers of such managers. * * * *"

*See also* Restatement (Second) of Agency §§ 49, comment d, and 159. That is the law in Idaho. *Clark v. Gneiting*, 95 Idaho 10, 501 P.2d 278 (1972); *Gore v. Richard Allen Mining Co.*, 61 Idaho 622, 105 P.2d 735 (1940). The position in which the Co-Op had placed Collinsworth regarding the management of its financial affairs clothed him with apparent authority to bind the Co-Op in the kind of transaction he engineered with Carpenter and Browne. *Chamberlain v. The Amalgamated Sugar Co.*, 42 Idaho 604, 247 P. 12 (1926). It was error, therefore, not to find the Co-Op had vested Collinsworth with apparent authority to enter a surety agreement. *See generally Intermountain Ass'n of Credit Men v. Pierce*, 43 Idaho 279, 251 P. 615 (1926).

## RETENTION OF BENEFITS AS AFFIRMANCE

In affirming the judgment below, the majority rejects appellant's contention that

the Co-Op ratified Collinsworth's actions. To reach this result the majority relies upon the Co-Op's repudiation of Collinsworth's actions, a repudiation I might add that was remarkably Janus-faced. There is no doubt that the Co-Op dispatched to Carpenter its notice of repudiation with all the necessary expedition required by the law of agency. It is also free from doubt that the Co-Op kept the benefits of Collinsworth's transaction, namely at least $6,953.55 of Carpenter's money. Section 99 of the Restatement (Second) of Agency clearly states that notwithstanding a principal's repudiation of the unauthorized acts of his agent, the law will find an affirmance if the principal retains the benefits of the agent's conduct after the principal becomes aware of the unauthorized conduct. *Killinger v. Iest,* 91 Idaho 571, 428 P.2d 490 (1967).

The majority finds no affirmance even though the Co-Op kept the benefit of Collinsworth's bargain by observing that the Co-Op, in any event, had an independent claim against Browne for the amount of the set-off. The majority states that the Co-Op is entitled to keep the money if it had an independent claim to it. As authority for its conclusion the majority relies upon obiter dictum in *T. W. & L. O. Naylor Co. v. Bowman,* 39 Idaho 764, 230 P. 347 (1924). I am unpersuaded by this dictum, particularly since the principle it states, while well sounding, is unrelated to the factual setting in the case before us now. The question in *Naylor* was whether a payment by A on behalf of C to B on a debt owed to B by C related to an independent obligation. The case was then decided on a different basis. In any event the situation here is different since no one suggests that Carpenter gave the money to the Co-Op to discharge Browne's debt to the Co-Op. The money was given to the Co-Op as a convenient way of getting the money to Browne. The fact that the Co-Op set-off the debt owed to it by Browne when it received the money from Carpenter on Browne's account does not mean, vis-a-vis Carpenter, that the Co-Op had an independent right to the money it obtained from Carpenter. Having acquired control of money from Carpenter solely by reason of the unauthorized acts of

its agent Collinsworth, an effective repudiation of those unauthorized acts required not merely a notice of repudiation but a return of the benefits acquired by those acts. Failure to return that money constitutes an affirmance of the agent's acts, notwithstanding notice of repudiation. *Hammitt v. Virginia Mining Co.,* 32 Idaho 245, 181 P. 336 (1919); *Blackwell v. Kercheval,* 27 Idaho 537, 149 P. 1060 (1915). Where the principal seeks to both repudiate the unauthorized acts of his agent yet also retain the benefits thereof, equity will not suffer the wrong to go without a remedy and will even go so far as to impose a constructive trust upon the property held by the principal. *Davenport v. Burke,* 30 Idaho 599, 167 P. 481 (1917). I would, therefore, reverse the judgment of the district court and since other issues remain undecided by the trial court, I would order a new trial.