830 P.2d 1185

Margarita MANNING, widow of the decedent Daryl Manning, and Helen Jane Heiskell, James Manning, M.D., Kathleen Rivard, John Manning, Carol Stein, and Henry Manning, Esq., the adult children of plaintiff Margarita Manning, and the decedent Daryl Manning, Plaintiffs–Respondents,

v.

TWIN FALLS CLINIC & HOSPITAL, INC., Virginia L. Anderson, L.P.N., individually, Defendants–Appellants,

and

Donna Gay Austin, R.N., individually, and health care providers 1 through 5, Defendants.

No. 18816.

Supreme Court of Idaho, Twin Falls, November 1991 Term.

April 8, 1992.

Rehearing Denied June 17, 1992.

Rosholt, Robertson, Tolman & Tucker, Chartered, Twin Falls, for defendants-appellants. Steven K. Tolman argued.

Webb, Burton, Carlson, Pedersen & Webb, Twin Falls, for plaintiffs-respondents. Kenneth L. Pedersen argued.

PER CURIAM.

## I.

This is a medical malpractice case wherein the decedent's family brought an action seeking an award of damages for the wrongful death of Daryl Manning, negligent and intentional infliction of emotional distress, and punitive damages. We affirm the jury verdict awarding compensatory damages and emotional distress damages. We also affirm the punitive damage award against nurse Anderson. However, we reverse the award of punitive damages against the hospital.

Daryl Manning, a sixty-seven-year-old man with a lengthy history of respiratory ailments, was admitted to the Twin Falls Clinic & Hospital on April 17, 1987, with chronic obstructive pulmonary disease (COPD) with marked hypoxemia and increased $CO_2$ retention. According to the record, COPD is characterized by a decrease in both the body's ability to transfer oxygen into the bloodstream and expel carbon dioxide from the bloodstream. Manning had previously been hospitalized several times, including hospitalization for episodes of COPD that were life threatening, and for two years prior to his last admission to the hospital, he had been on prescribed twenty-four-hour-a-day supplemental oxygen which was administered through a nasal canula.

At the time of his hospitalization on April 17, 1987, Manning's disease was in its final stage and the treating physician, Dr. Kassis, told Manning's family that his death was imminent. Upon his admission, and at the request of the family, the record indicates that Manning was classified as a "no code" patient meaning the hospital and its employees were directed by the family not to place Manning on a respirator or resuscitate him if he were to suddenly expire. The family and Dr. Kassis agreed this was to be Manning's last hospital admission. Subsequent to Manning's admission to the hospital, arterial blood gas tests indicated a continual deterioration of his condition. Virtually all of Manning's strength and energy were needed for breathing and he was unable to sleep or eat.

On April 20, 1987, the day of the event in question, a decision was made by the hospital staff to move Manning to a private room. At that time the treating physician estimated Manning had 24 hours to live. Just prior to the attempted move, an arterial blood gas test was taken. Although the results were not available at the time nurses Anderson and Austin attempted to move Manning, the results of the blood gas test indicated Manning's condition had deteriorated to a point precariously close to

cessation of the body's ability to sustain life. Preparatory to the move, Manning's supplemental oxygen was temporarily disconnected. Despite the request of family members present who strenuously urged that Manning be given a portable oxygen unit during the move, the nurses declined to do so because of the relatively short distance of the transfer. Manning's bed was pushed no more than fifteen feet when his condition suddenly and dramatically worsened. In the few seconds that the supplemental oxygen was disconnected, Manning suffered extreme respiratory distress and, according to the record, he may have stopped breathing altogether. Resuscitation efforts were attempted and a doctor was summoned. However, when Manning was identified as a "no code" patient, the doctor provided no treatment. Manning died shortly thereafter.

At the time of Manning's death the hospital had a standing committee in place which was responsible for reviewing all deaths occurring in the facility. After reviewing the circumstances, the committee determined that removal of the supplemental oxygen did not cause Manning's death because an arterial blood gas test taken minutes before the incident indicated his condition had deteriorated to a point nearly incompatible with the sustaining of life. Because the committee concluded the brief removal of the supplemental oxygen probably did not cause Manning's death, the hospital did not reprimand or fire the nurses involved. Even at the time of trial, the hospital and nursing staff maintained the nurses had done nothing wrong because the removal of oxygen did not cause Manning's death. Notwithstanding the committee's determination that the removal of oxygen did not cause Manning's death, a policy was implemented shortly after the incident requiring patients who were on prescribed oxygen to be moved with portable supplemental oxygen.

At trial, evidence was presented indicating nurses at the hospital regularly moved patients from room to room without supplemental oxygen. The director of nursing services testified that the nurses had maintained this practice for at least six years,

and there was testimony from another nurse that the practice had been in existence for as long as fourteen years. The nurses defended the practice contending the small size of the hospital allowed patient moves to be made quickly, and that there had never been a problem in the past. The hospital administration and doctors testified this practice was conducted without their knowledge or authorization. At trial, one of the hospital's doctors testified that it was a breach of the standard of nursing care for Manning to be moved without his prescribed oxygen. Dr. Kassis also testified that Manning's death was "caused by a sudden plummet of his already terribly low oxygen level" and that the plummet was the result of Manning's prescribed oxygen being removed.

After a jury trial, plaintiffs were awarded $3,500 compensatory damages and plaintiff Helen Jane Heiskell was awarded $1,000 for emotional distress. In addition, the jury awarded $300 punitive damages against nurse Anderson and $180,000 punitive damages against the hospital. Nurse Austin was relieved of all liability.

The issues we find dispositive on appeal are whether the trial court properly instructed the jury, and whether the issue of punitive damages should have been submitted to the jury.

## II.

During trial, the hospital objected to the use of Instruction 16 involving a "substantial factor" causation standard, and Instruction 17 consisting of an "increased risk of harm" instruction.

### A.

The standard of review when reviewing jury instructions on appeal requires us to determine whether the jury was properly and adequately instructed. Accordingly, we must review the instructions and ascertain whether the instructions, when considered as a whole, fairly and adequately present the issues and state the applicable law. *Leazer v. Kiefer*, 120 Idaho 902, 821 P.2d 957 (1991); *Matter of*

*Estate of Roll,* 115 Idaho 797, 770 P.2d 806 (1989); *McBride v. Ford Motor Co.,* 105 Idaho 753, 673 P.2d 55 (1983). Reversible error only occurs when an instruction misleads the jury or prejudices a party. *Salinas v. Vierstra,* 107 Idaho 984, 695 P.2d 369 (1985).

■ Instruction 16 was a modified version of IDJI 230 which removed the language requiring a "but for" causation analysis. Instruction 16 provided:

> When I use the expression "proximate cause," I mean a cause which, in natural or probable sequence, produced the complained injury, loss or damage. It need not be the only cause. It is sufficient if it is a substantial factor in bringing about the injury, loss or damage.

In our recent case of *Fussell v. St. Clair,* 120 Idaho 591, 818 P.2d 295 (1991), we held that application of the "but for" causation contained in the standard IDJI 230 was inappropriate in those cases involving multiple causes or factors. In *Fussell,* we approved the following modified version of IDJI 230 for application in multiple cause cases:

> When I use the expression "proximate cause," I mean a cause which, in natural or probable sequence, produced the damage complained of. It need not be the only cause. It is sufficient if it is a substantial factor concurring with some other cause acting at the same time, which in combination with it, causes the damage.

The instant case involved multiple factors or causes. The plaintiffs asserted

the nurses' conduct caused Manning's death while the hospital contended Manning died from his pre-existing illness as evidenced by arterial blood gas tests taken moments before the attempted move. Instruction 16, while not identical to the instruction approved in *Fussell,* was adequate, and we hold that the trial court did not err by instructing the jury as to "substantial factor" causation in Instruction 16.

## B.

■ The hospital also asserts that reversible error was committed when the jury was instructed as to "increased risk of harm" as a basis for finding the nurses liable for Manning's death. Instruction 17 provided:

> A nurse who undertakes to render services to a patient which one in her position should recognize as necessary for the protection of that patient's well-being is subject to liability for death resulting from her failure to exercise the applicable standard of care to perform to the undertaking, if the failure to exercise such care increases the risk of death at the time and place it occurred.

The propriety of the doctrine of "increased risk of harm" is an issue of first impression in this jurisdiction.[1] The doctrine of "increased risk of harm" along with the corresponding doctrine of "lost chance"[2] evolved from § 323 of the Restatement of Torts (Second).[3] The doctrines of "increased risk of harm" and "lost chance" were originally utilized to reduce the causation standard required to over-

---

1. In *Hilden v. Ball,* 117 Idaho 314, 787 P.2d 1122 (1990), we declined to address an appellant's claim that a "lost chance" jury instruction should have been given because the issue had not been preserved for appeal.

2. The "increased risk of harm" element focuses on whether the defendant's conduct has increased plaintiff's risk of harm, while the "lost chance" doctrine considers whether the defendant's conduct deprived the plaintiff of a chance of recovery. The cases analyzing the respective doctrines often use the terms interchangeably, and the respective doctrines are apparently applied the same way. *See, Causation–Loss of Chance,* 54 A.L.R.4th 10 (1987); *Damages–Loss of Chance,* 81 A.L.R.4th 485 (1990).

3. The Restatement of Torts (Second), § 323 provides:

   **Negligent Performance of Undertaking to Render Services**

   One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

   (a) his failure to exercise such care increases the risk of such harm, or

   (b) the harm is suffered because of the other's reliance upon the undertaking.

come a motion for directed verdict in certain medical malpractice claims. A review of the reported cases that have considered these doctrines indicates a wide disparity in acceptance and application.[4]

Our review of the cases that have considered the rationale of the doctrines of "increased risk of harm" or "lost chance" convinces us to reject both doctrines. The "substantial factor" standard of proof for proving proximate causation strikes a fair balance between the claimant and the defense. It is not necessary to have any further reduction in the claimant's burden of proving proximate cause. It was error for the trial court to instruct the jury on the theory of "increased risk of harm." However, under the circumstances of this particular case, we conclude that it was not so prejudicial as to require a new trial. *Salinas v. Vierstra*, 107 Idaho 984, 695 P.2d 369 (1985).

### III.

■ Nurse Anderson and the hospital both assert there were not sufficient facts presented in this case to support an award of punitive damages, and that this issue should never have been submitted to the jury. It is well settled that punitive damages are not favored in the law and should be awarded only in the most unusual and compelling circumstances, and are to be awarded cautiously and within narrow limits. *Jones v. Panhandle Distribs., Inc.*, 117 Idaho 750, 792 P.2d 315 (1990); *Soria v. Sierra Pac. Airlines, Inc.*, 111 Idaho 594, 726 P.2d 706 (1986); *Cheney v. Palos Verdes Inv. Corp.*, 104 Idaho 897, 665 P.2d 661 (1983); *Linscott v. Rainier National Life Ins. Co.*, 100 Idaho 854, 606 P.2d 958 (1980); *Hatfield v. Max Rouse & Sons Northwest*, 100 Idaho 840, 606 P.2d 944 (1980).

### A.

■ The decision whether to submit the question of punitive damages to a jury rests within the sound discretion of the trial court. *Hoglan v. First Sec. Bank*, 120 Idaho 682, 819 P.2d 100 (1991); *Eddins Constr., Inc. v. Bernard*, 119 Idaho 340, 806 P.2d 433 (1991); *Soria v. Sierra Pac. Airlines, Inc.*, 111 Idaho 594, 726 P.2d 706 (1986). In *Garnett v. Transamerica Ins. Services*, 118 Idaho 769, 781, 800 P.2d 656, 668 (1990), we stated:

> In addressing whether the trial court abused its discretion in allowing the jury to consider punitive damages, both *Cheney* and *Soria* focus on the sufficiency of the evidence to support the jury's award....

> As we interpret this abuse-of-discretion standard of review set forth in *Cheney* and *Soria*, it is essentially a substantial evidence standard.

*Accord Hoglan v. First Sec. Bank, id.; Eddins Construction, Inc. v. Bernard, id.* Therefore, on appeal our task is to determine whether the record contains substantial evidence to support an award of punitive damages. In *Cheney*, we explained the requirements for upholding an award of punitive damages.

> An award of punitive damages will be sustained on appeal only when it is shown that the defendant acted in a manner that was "an extreme deviation from reasonable standards of conduct, and that the act was performed by the defendant with an understanding of or disregard for its likely consequences." The justification for punitive damages must be that the defendant acted with an extremely harmful state of mind, whether that state be termed "malice, oppression, fraud or gross negligence"; "malice, oppression, wantonness"; or simply "deliberate or willful." (Citations omitted).

*Cheney v. Palos Verdes Inv. Corp.*, 104 Idaho 897, 905, 665 P.2d 661, 669 (1983).

■ Applying these standards to the record before us, we are satisfied that the trial court did not abuse its discretion in presenting the issue of punitive damages as to nurse Anderson to the jury. The

---

4. For a general overview of reported cases applying the doctrines of loss of chance or increased risk of harm, see *Causation—Loss of Chance*, 54 A.L.R.4th 10 (1987); *Damages—Loss of Chance*, 81 A.L.R.4th 485 (1990).

plaintiffs' expert witness testified regarding the community standard of nursing care and concluded that nurse Anderson's conduct was an extreme deviation from this standard. Evidence was also presented that nurse Anderson disconnected Manning's oxygen despite the pleadings of family members present who claimed he could not survive without his oxygen, and who requested that he be provided a portable oxygen unit preparatory to the move. From this evidence, we agree a jury could have found nurse Anderson's conduct was grossly negligent and that she acted with disregard for the consequences that were likely to follow. Because we find there was substantial evidence to support an award of punitive damages against nurse Anderson, we hold that the trial court did not abuse its discretion in submitting the issue to the jury. Accordingly, the punitive damage awarded against nurse Anderson is supported by the evidence in the record and is affirmed.

### B.

At trial, the plaintiffs asserted that the hospital ratified the conduct of its nurses. In addition, they argue on appeal that the facts presented at trial were sufficient to support a jury determination that the hospital had authorized the conduct at issue or that the hospital had participated in the grossly negligent conduct by allowing such a practice to continue.

The hospital, on the other hand, contends as a matter of law, that its conduct cannot constitute ratification and that because ratification was alleged as the sole basis for an award of punitive damages, the issue of punitive damages against it should never have been submitted to the jury. We agree.

It is settled beyond dispute in Idaho that a principal is liable for punitive dam-

ages based on the acts of its agent only in circumstances in which the principal participated, or in which the principal authorized or ratified the agent's conduct. *Openshaw v. Oregon Auto. Ins. Co.*, 94 Idaho 335, 487 P.2d 929 (1971); *Boise Dodge, Inc. v. Clark*, 92 Idaho 902, 453 P.2d 551 (1969); *Curtis v. Siebrand Bros. Circus & Carnival Co.*, 68 Idaho 285, 194 P.2d 281 (1948). Furthermore, it is well established that punitive damages may not be assessed against a principal based upon the acts of an agent absent a clear showing of authorization or ratification. *Hatfield v. Max Rouse & Sons Northwest*, 100 Idaho 840, 606 P.2d 944 (1980).

A careful and thorough review of the record before us indicates that the Mannings tried the punitive damage issue against the hospital solely upon the theory of ratification. Plaintiff's original and amended pleadings alleged ratification as the only theory for imposing punitive damages against the hospital.[5] The record clearly demonstrates that the case was not tried on the theory of authorization, and nowhere in the record does it appear an authorization instruction was requested. Similarly, the record confirms that the punitive damage award against the hospital cannot be supported based upon a theory of participation. Although the Mannings claim the jury could have found the hospital was grossly negligent for allowing the nursing practice to continue, such a claim is unsupportable on appeal because the record before us demonstrates that no evidence establishing the hospital's standard of care in such circumstance was presented at trial. Similarly, no evidence was presented at trial indicating a corresponding deviation by the hospital from that standard of care.[6] It is well established that more than an agent's gross negligence

---

5. Paragraph 50 of plaintiffs' complaint and amended pleadings states:
    50. The Defendant Twin Falls Clinic and Hospital ratified the acts of the two nurses involved in this incident.

6. The record reveals that the plaintiffs' expert witness testified as to a nursing standard of

care, and that the nurses' conduct was an extreme deviation from that standard of care. The record is devoid of any testimony setting forth the hospital's applicable standard of care, and whether it was a violation of that standard for the hospital to allow the nurses' practice to not be detected.

is required to hold a principal liable for punitive damages.

We recognize that Idaho is one of those states which applies the rule that a principal is liable for punitive damages based upon the acts of his agents only in which the principal participated or which he authorized or ratified. *Boise Dodge v. Clark*, 92 Idaho 902, 905, 453 P.2d 551, 554 (1969). Furthermore, as we stated in *Openshaw v. Oregon Automobile Insurance Co.:*

> To be entitled to an award of punitive damages against a corporation the complaining party must show that the principal (or when the principal is a corporation, its directors and managing officers) participated in or authorized or ratified the agent's acts. *Boise Dodge v. Clark*, 92 Idaho 902, 453 P.2d 551 (1969); *Curtis v. Siebrand Bros. Circus & Carnival Co.*, 68 Idaho 285, 194 P.2d 281 (1948); Restatement of Torts, § 909.

94 Idaho at 338, 487 P.2d at 932.

■ It is well established that parties will be held to the theory on which the case was tried in the trial court. *See Masters v. State*, 105 Idaho 197, 668 P.2d 73 (1983); *DeAtley Corp. v. Otto*, 95 Idaho 586, 513 P.2d 638 (1973); *Frasier v. Carter*, 92 Idaho 79, 437 P.2d 32 (1968); *Christensen v. Stuchlik*, 91 Idaho 504, 427 P.2d 278 (1967). Thus, our analysis on appeal is necessarily limited to a determination of whether the record supports plaintiffs' sole theory of ratification.

■ The hospital asserts that the trial court erred in submitting the issue of punitive damages against it to the jury because ratification of the nurses' conduct had not been shown. We agree. As we have previously noted, "ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act as to some or all persons, is given effect as if originally authorized by him." *Carpenter v. Payette Valley CO-OP*, 99 Idaho 143, 578 P.2d 1074 (1978), citing Restatement of Agency (Second) § 82. The "essence of ratification by principal of act of agent is manifestation of mental deter-

mination by the principal to affirm the act, and this may be manifested by written word or by spoken word or by conduct, or may be inferred from known circumstances and principal's acts in relation thereto." *Black's Law Dictionary* 1262 (6th ed. 1990).

In *T.W. & L.O. Naylor Co. v. Bowman*, 39 Idaho 764, 230 P. 347 (1924), we recognized these principles and stated:

> [A] principal may ratify the unauthorized act of his agent if, at the time of such ratification he has knowledge of all the material facts connected with the transaction and the ratification may be either by words or by conduct indicating an intention on the part of the principal to adopt the act as his own, and such intention may be implied from an acceptance of the benefits of the unauthorized act.

*Id.*, 39 Idaho at 768–69, 230 P. at 348. The essence of ratification is a manifestation of intent to approve or sanction an act of an agent by a principal operating with knowledge of all material facts. *Id.* Although the effect of a ratified act is essentially the same as an act that was authorized, the distinguishing element is that ratification takes place after the act has occurred while authorization must occur before conduct arises. *See Carpenter v. Payette Valley CO-OP*, 99 Idaho 143, 578 P.2d 1074 (1978), citing Restatement of Agency (Second) § 82; *cf. Twin Falls Livestock v. Mid-Century Ins. Co.*, 117 Idaho 176, 786 P.2d 567 (Ct.App.1989) (no authorization occurs where the evidence indicated the principal learned of conduct after the fact). Consequently, our analysis must focus on whether substantial evidence exists in the record upon which a jury could find that subsequent to Manning's death, the hospital with knowledge of all material facts, expressed an intent to approve or sanction the nurses' conduct.

■ In support of its position that the hospital ratified the conduct of the nurses, the plaintiffs argue that the nurses were not reprimanded or criticized for their conduct, that the hospital maintained that nurses Anderson and Austin had done

nothing wrong,[7] and that the hospital never apologized to the Mannings for the conduct of the nurses.[8] The Mannings contend this constitutes substantial evidence of implied ratification. We disagree.

In *Carpenter*, we considered the doctrine of implied ratification in a contract setting. We noted that ratification

> may also be implied if the principal, with full knowledge of the material facts, receives, accepts and retains benefits from the contract; remains silent, acquiesces in or fails to repudiate or disaffirm the contract; or otherwise exhibits conduct demonstrating an adoption and recognition of the agent's act as binding.

*Id.*, 99 Idaho at 147, 578 P.2d at 1078. We also observed in *Carpenter* that implied ratification is a means by "which the principal is estopped from denying the unauthorized act of his agent because to do so would result in the unjust enrichment of the principal." *Id.*, 99 Idaho at 147 n. 5, 578 P.2d at 1078 n. 5; *see also, Twin Falls Livestock v. Mid–Century Ins. Co.*, 117 Idaho 176, 786 P.2d 567 (Ct.App.1989) (ratification may be implied where the principal accepts benefits of an unauthorized act). In addition to principles of unjust enrichment, an additional rationale for implied ratification is based on principles of estoppel. *See Carpenter v. Payette Valley CO–OP*, 99 Idaho 143, 578 P.2d 1074 (1978); 3 Am.Jur.2d *Agency*, § 184 (1986); Restatement of Agency (Second) § 82, comment c; *see* Seavy, *Ratification By Silence*, 103 U.Pa.L.Rev. 30 (1955).[9]

The requirement of a clear showing of ratification in *Hatfield v. Max Rouse & Sons Northwest*, 100 Idaho 840, 606 P.2d 944 (1980), is particularly important when the doctrine of implied ratification is asserted. The plaintiffs' contention that the hospital's failure to punish or reprimand the nurses constitutes sufficient evidence of ratification is not persuasive. In addition to falling short of a clear showing of ratification as required by *Hatfield*, such conduct is not indicative of an intent to ratify. A review of the jurisdictions that have considered the issue indicates that as a general rule, the failure to punish or reprimand, at least standing alone, is insufficient evidence to support a finding of ratification. *See Woodard v. City Stores*, 334 A.2d 189 (D.C.App.1975); *Dart Drug, Inc. v. Linthicum*, 300 A.2d 442 (D.C.App.1973); *Costa v. Able Distributors, Inc.*, 3 Haw.App. 486, 653 P.2d 101 (Haw.Ct.App.1982); *Abraham v. S.E. Garages*, 50 Haw. 628, 446 P.2d 821 (1968); *Fisher v. Hering*, 88 Ohio App. 107, 97 N.E.2d 553 (Ohio Ct.App.1948); *Urabzo v. Humpty Dumpty Supermarkets*, 463 P.2d 352 (Okla.Ct.App.1969); *J.C. Penney Co. v. Gravelle*, 62 Nev. 434, 155 P.2d 477 (1945); *Green v. Jackson*, 674 S.W.2d 395 (Tex.App.1984); *Home Telephone & Elec. Co. v. Branton*, 7 S.W.2d 627 (Tex.1928).

An employer's reasons for continuing an employment relationship or declining to reprimand an employee may be varied, and in the absence of clear evidence of an intent to ratify cannot be the basis to uphold an award of punitive damages. Furthermore, from a public policy standpoint, it would be an unwise rule of law that mandates disciplinary action whenever misconduct is alleged. As the Supreme Court of

---

**7.** The basis for this assertion by the plaintiffs was the committee's determination that the nurses' conduct did not cause Manning's death.

**8.** Our analysis is limited to ratification, because that was the sole theory presented at trial. Issues relating to the independent gross negligence of the hospital for allowing the practice to continue is not before us because there was no evidence submitted at trial in support of that theory. Similarly, evidence suggesting or implying that the practice was impliedly authorized by the length of time the nursing practice was continued is not pertinent because the theory of authorization was not plead nor presented at trial and the issue of ratification focuses on approval or adoption of the conduct after the conduct has occurred.

**9.** For example, where a principal undertakes an "act which is inconsistent with the non-existence of affirmance, such as bringing an action upon a prior contract purported to be made for him, the principal is estopped from denying ratification of the prior contract." Warren A. Seavy, *Ratification By Silence*, 103 U.Pa.L.Rev. 30–31 (1955). Similarly, where a principal's act or omission does something which misleads a third party into believing a prior transaction was authorized or ratified, the principal is estopped to deny the validity of the transaction. *Id.*

Hawaii reasoned in *Abraham v. S.E. Onorato Garages*, 50 Haw. 628, 446 P.2d 821, 827 (1968):

> The continuance of [the defendant's] employment alone is insufficient to show such approval. Such continuance is "too readily open to explanation on other grounds." If we held otherwise, we would in effect be requiring the discharge of an employee whenever an employer learns of an employee's wrongful act. Surely we should wish to promote a policy of clear and objective reflection when a man's job is at stake. Since we are all subject to human frailties, we think that the law should permit an employer to retain and give an opportunity to an employee to redeem himself where he has acted tortiously, without the employer being found to have ratified the tort. Of course, the employer would thereafter be on notice that such conduct on the part of the employee is a future possibility, and he would be required to take reasonable steps to assure it would not occur again. (Citations omitted).

Although some of the jurisdictions considering the issue have held that ratification can never be shown by continued employment or the failure to discipline, *see Home Tel. & Elec. v. Branton*, 7 S.W.2d 627 (Tex.Civ.App.1928), we hold in the instant case that the hospital's failure to reprimand or punish the nurses, standing alone, was insufficient to support a finding of ratification on the basis of the record before us.

Similarly, we are satisfied that the hospital's failure to apologize, and the hospital's defense at trial that the nurses did nothing wrong does not constitute sufficient evidence to support a finding of ratification. In addition to the lack of evidence indicating an intent to ratify, the plaintiffs' position, if adopted, would effectively require a principal to admit its agent's negligence or wrongdoing in every case to avoid a finding of ratification. Such a double-edged position is not sound policy.

In Mannings' case-in-chief, uncontroverted evidence was presented showing that shortly after his death, the hospital adopted a policy requiring all patients on prescribed supplemental oxygen to be moved in the future with supplemental oxygen in place. This act of the hospital clearly rejects any contention that the hospital acquiesced, or failed to repudiate or disaffirm the conduct of the nurses.

The record indicates the hospital moved for a directed verdict at the close of the Mannings' case-in-chief. Our role in determining whether a directed verdict should have been granted is well established. On appeal we apply the same standard as does the trial court which passed on the motion originally, and whether a verdict should be directed is purely a question of law over which we exercise free review. *Garnett v. Transamerica Ins. Servs.*, 118 Idaho 769, 800 P.2d 656 (1990), and *Hake v. DeLane*, 117 Idaho 1058, 793 P.2d 1230 (1990), citing *Quick v. Crane*, 111 Idaho 759, 727 P.2d 1187 (1986). We are required to ascertain whether substantial evidence exists upon which a jury could properly find a verdict for the non-moving party, and in analyzing this question, we view all the evidence and draw all inferences in favor of the non-moving party. *E.g.*, *Quick*, 111 Idaho at 764, 727 P.2d at 1192. Accordingly, when considering whether a motion for directed verdict should have been granted, our task is to apply the foregoing rules and determine whether substantial evidence was presented upon which a jury could have found that the hospital ratified the nurses' actions.

■ After reviewing all of the evidence presented in the Mannings' case-in-chief, and drawing all inferences available, we are unable to conclude that substantial evidence was presented upon which a jury could have found a clear showing of ratification. Because ratification was the sole basis on which an award for punitive damages against the hospital was sought, we hold that it was error for the trial court to deny the hospital's motion for a directed verdict regarding the punitive damage claim against the hospital. Accordingly, the award of punitive damages against the hospital is reversed.

Because we hold the issue of punitive damages against the hospital should not have been submitted to the jury, we need not consider the hospital's other arguments regarding alleged error in the punitive damage award, and whether inappropriate evidence relating to the hospital's financial condition was presented.

### IV.

We have reviewed the other claims of error by the appellant, and find them either to be mooted as a result of our decision, or find no error on the part of the trial court, as in the claim that the trial court erroneously concluded that the plaintiffs' expert witness was not qualified to render an opinion.

The judgment of the district court is affirmed, except as to the award of punitive damages against the defendant Twin Falls Clinic & Hospital, Inc., which is reversed. The cause is remanded to the district court to enter an amended judgment excluding the award of punitive damages against the hospital. Costs to appellants. No attorney fees allowed.

JOHNSON and McDEVITT, JJ., concur.

BOYLE, J., sat, but did not participate and resigned prior to the issuance of the Court's opinion.

BAKES, Chief Justice, concurring specially.

I concur in Parts I, IIB, III and IV.

As to Part IIA, in my opinion the facts of this case are more like *Hilden v. Ball*, 117 Idaho 314, 787 P.2d 1122 (1990), than *Fussell v. St. Clair*, 120 Idaho 591, 818 P.2d 295 (1991). Accordingly, IDJI 230, the single cause proximate cause instruction should have been given rather than the "substantial factor" causation instruction in Instruction No. 16. However, given the outcome in this case, the error is probably harmless.

BISTLINE, Justice, concurring in part, and dissenting in part.

This is another of an increasing number of cases where a highly qualified district judge has made a judicial determination accepting the jury's decision, only to find that a five-member appellate court ingloriously and disingenuously elects to interfere.

I can concur in Part I and Part II of the majority opinion. I dissent in part as to Part III, particularly as to the citing of *Linscott v. Rainier* and *Hatfield v. Max Rouse & Sons Northwest*,[10] as purporting to be reputable authority for the principles stated. Those two decisions were entered in questionable circumstances which deprived both of any vitality or precedential value. Therefore, I concur in Part IIIA, but dissent as to Part IIIB. No one presently on the Court participated in either the *Linscott* case or the *Max Rouse* case. The stage was set for those two cases when two members of this Court waged an undeclared war on exemplary damages in the companion cases of *Cox v. Stolworthy*, 94 Idaho 683, 496 P.2d 682 (1972), and *Jolley v. Puregro*, 94 Idaho 702, 496 P.2d 939 (1972). The *Jolley* case cited to the *Cox* case, which was authored by Justice McFadden who later was solely responsible for authoring the *Linscott* case and the *Max Rouse* case, where the two respective defendants were favored with an astonishing decision destroying a jury verdict and a district trial court award of substantial exemplary damages for outrageous conduct. All of the foregoing was, in this writer's experienced view, attributable to efforts of the ABA to sabotage awards of exemplary damages.

Not questioning the statement of underlying facts in this opinion, the record which we review demonstrates that the clinic/hospital was wholly indifferent as to what the nurses were doing, what they were not doing, and what they should have been doing. It appears all too clearly that there was *no one* in authority; in essence the clinic was a ship afloat with no captain on

---

**10.** *Linscott v. Rainier National Life Insurance Co.*, 100 Idaho 854, 606 P.2d 958 (1980); *Hatfield v. Max Rouse & Sons Northwest*, 100 Idaho 840, 606 P.2d 944 (1980).

board. It claims absolution from liability by reason of its election to remain ignorant, a defense apparently appealing to the other members of the Court. This Court has often stated the truism, that where judge, or jury, as the case may be, has reached a correct result but has done it on a theory not relied upon, the verdict and the judgment will be affirmed on the correct theory. This is clearly what happened here.

The jury cannot be said to have gone awry in absorbing the evidence before it, all of which demonstrated a wholly lackadaisical attitude on the part of the corporate entity, notwithstanding that patient care was the very nature of the corporate business venture.

Because the respondents are ably represented by counsel in this $180,000 matter, a petition for rehearing is anticipated with great expectation which will advise the Court in considerable detail where it has gone astray in invalidating a jury's award of exemplary damages. It seems that just a few months ago the Court similarly performed the same service (or disservice) in *O'Dell v. Basabe*, 119 Idaho 796, 810 P.2d 1082 (1991).