# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 34731

H. RAY HARRISON,

    Plaintiff-Appellant,

and

JULIE ANDERSON,

    Plaintiff,

v.

D. LEE BINNION, M.D. and SAINT ALPHONSUS REGIONAL MEDICAL CENTER, INC., an Idaho non-profit corporation,

    Defendants-Respondents,

and

JEFFREY HARTFORD, M.D.,

    Defendant.

Boise, February 2009 Term

2009 Opinion No. 90

Filed: July 7, 2009

Stephen W. Kenyon, Clerk

---

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, in and for Ada County. The Hon. Cheri C. Copsey, District Judge.

The judgment of the district court is affirmed in part and vacated in part.

Rossman Law Group, PLLC, Boise, for appellant. Eric S. Rossman argued.

Moffatt, Thomas, Barrett, Rock & Fields, Chartered, Boise for respondent Binnion. Patricia M. Olsson argued.

Gjording & Fouser, Boise, for respondent Saint Alphonsus Regional Medical Center, Inc. Jack S. Gjording argued.

---

EISMANN, Chief Justice.

This is an appeal from: (a) an order denying a motion to amend the complaint to assert a claim of negligent credentialing against a hospital; (b) an order refusing to order discovery of certain medical records provided by a physician to the board of medicine; and (c) the granting of summary judgment in favor of an emergency room physician. We reverse the order of the district court holding that Idaho Code § 39-1392c grants immunity from a claim for negligent credentialing. We decline to decide the issue of whether certain medical records provided to the board of medicine were privileged because the appellant did not name the physician claiming that privilege as a respondent to this appeal. We affirm the grant of summary judgment in favor of the emergency room physician. Finally, we decline to award the emergency room physician attorney fees on appeal.

## I. FACTS AND PROCEDURAL HISTORY

On November 14, 2003, at about 11:35 p.m., H. Ray Harrison arrived at the emergency room (ER) of Saint Alphonsus Regional Medical Center (Hospital). His symptoms included nausea, vomiting, diarrhea, imbalance, and speech impediment. According to his family, Harrison's condition had been deteriorating over the preceding seven weeks, with episodes of vomiting and diarrhea occurring three or four times a day. Julie Anderson, his significant other whom he later married, reported that for the prior three days he had not consumed anything other than alcoholic beverages. A nurse drew blood from Harrison for necessary chemistry panels, including a basic metabolic panel of blood tests called a Chem 7.

Dr. Binnion was working in the ER that night. At about 1:00 a.m. she began her assessment of Harrison. About forty minutes later, she received lab results from the Chem 7 showing that Harrison's blood sodium level was 96 milliequivalents per liter (mEq/L), a low level of sodium that was life-threatening. The lab results also showed that Harrison's blood alcohol content was 0.13. Dr. Binnion ordered that Harrison be given an intravenous (IV) saline solution at the rate of 200 cc's per hour. The saline IV was started at 1:50 a.m. and was replaced at 2:20 a.m.

Dr. Binnion could not admit Harrison into the hospital. At about 2:25 a.m. she telephoned Dr. Hartford, who was the on-call physician for Harrison's treating physician. Dr. Hartford agreed to admit Harrison into the hospital. Dr. Binnion suggested that Harrison be admitted to the telemetry unit, but Dr. Hartford thought that it would be too stimulating in light

of Harrison's alcohol abuse and that he should be admitted to the medical floor. Dr. Binnion wrote the admission orders for Dr. Hartford. Those orders included that Harrison be given IV sodium at 200 cc's per hour and that Harrison have blood draws every six hours for a Chem 7 test. Apparently because of the lack of available beds in the medical unit, Harrison was admitted to the orthopedic unit at 3:26 a.m. At that point, Dr. Binnion was no longer responsible for Harrison's care.

Dr. Hartford first saw Harrison at 11:17 a.m. on November 15, 2003. By that time, results of the second Chem 7 test done at 6:00 a.m. showed a sodium level of 105 mEq/L. After reviewing the medical records and examining Harrison, Dr. Hartford wrote his treatment plan. It included IV sodium at 200 cc's per hour and a Chem 7 test done every six hours.

Dr. Hartford continued the saline IV until 10:00 a.m. on November 17, 2003. During that period, Harrison's sodium levels continued to increase to 110 mEq/L at 12:27 p.m. on November 15, 2003; to 114 mEq/L at 5:58 p.m. on November 15, 2003; to 124 mEq/L at 3:57 a.m. on November 16, 2003; and to 126 mEq/L at 10:10 a.m. on November 16, 2003.

Harrison's condition continued to deteriorate under Dr. Hartford's care. On November 22, 2003, another physician diagnosed Harrison as suffering from central pontine myelinolysis (CPM), a condition in which the myelin sheath covering brainstem nerve cells is destroyed which prevents nerve signals being transmitted properly. CPM is caused by a too rapid change in sodium levels in the body. Harrison contends that his CPM was caused by his sodium level rising too rapidly.

On April 28, 2004, Harrison and Anderson (Plaintiffs) filed this action against Drs. Hartford and Binnion and the Hospital alleging that they were negligent in their treatment of Harrison and that they also committed the torts of negligent and intentional infliction of emotional distress. On November 15, 2005, Plaintiffs filed a motion to amend their complaint to allege that the Hospital was negligent in credentialing Dr. Hartford. After the motion was briefed and argued, the district court denied the motion to amend. It held that there was no cause of action in Idaho for negligent credentialing because Idaho Code § 39-1392c granted the Hospital immunity from such a claim.

During the litigation, the Plaintiffs served interrogatories and requests for production upon Dr. Hartford seeking information regarding any substance abuse treatment he had received and whether he had been disciplined by the Idaho Board of Medicine. Dr. Hartford objected to

this discovery, and on May 26, 2005, the Plaintiffs filed a motion to compel discovery. The district court held that under Idaho Rule of Evidence 503, Dr. Hartford had a privilege to refuse to disclose communications made for the purpose of diagnosis or treatment of alcohol or drug addiction and that Dr. Hartford had not waived that privilege by disclosing the information to the Idaho Board of Medicine. The court also held that the under Idaho Code § 39-308, the fact of whether Dr. Hartford had obtained treatment through a certified substance abuse treatment program was also privileged. The court therefore denied the motion to compel to the extent that it sought discovery of such privileged information.

The Plaintiffs then sought to obtain from the Idaho Board of Medicine documents that had been entered as exhibits during an administrative disciplinary hearing regarding Dr. Hartford. On April 3, 2006, Dr. Hartford filed a motion for a protective order seeking to prevent disclosure of those documents to the extent that they consist of records relating to substance abuse treatment. He also sought redaction of any references to substance abuse treatment in letters from his former attorney to the Board of Medicine. The district court granted that motion.

The Plaintiffs ultimately settled their claims against Dr. Hartford. Pursuant to stipulation, on August 29, 2006, the district court entered an order dismissing with prejudice the Plaintiffs' claims against Dr. Hartford.

On April 27, 2007, Dr. Binnion moved for summary judgment on the grounds that the Plaintiffs' expert did not show that he was familiar with the applicable standard of care and there was no evidence that any alleged negligence by Dr. Binnion was a proximate cause of any harm to Harrison. After briefing and argument, the district court granted the motion on the ground that there was no evidence of causation with respect to the alleged negligence of Dr. Binnion. The district court also held that the Plaintiffs' expert had not familiarized himself with the applicable standard of care. On Plaintiffs' motion for rehearing, the court modified its order granting summary judgment by reserving until trial any ruling on whether Plaintiffs' expert had adequately familiarized himself with the applicable standard of care.

Pursuant to stipulation, on September 18, 2007, the district court entered an order dismissing Plaintiffs' remaining claims against the Hospital. Harrison then timely appealed.

4

## II. ISSUES ON APPEAL

1. Did the district court err in holding that Idaho Code § 39-1392c granted the Hospital immunity from a claim of negligent credentialing?

2. Did the district court err in holding that Dr. Hartford did not waive any privilege when he presented documents regarding his substance abuse treatment to the Idaho Board of Medicine in connection with a disciplinary hearing?

3. Did the district court err in granting Dr. Binnion's motion for summary judgment on the issue of causation?

4. Is Dr. Binnion entitled to an award of attorney fees on appeal pursuant to Idaho Code § 12-121?

## III. ANALYSIS

### A. Did the District Court Err in Holding that Idaho Code § 39-1392c Granted the Hospital Immunity from a Claim of Negligent Credentialing?

The Plaintiffs sought to amend their complaint to add a claim against the Hospital for negligent credentialing in granting hospital privileges to Dr. Hartford. The district court held that such claim was barred by Idaho Code § 39-1392c.[1] The applicable portion of that statute provides, "The furnishing of information or provision of opinions to any health care organization or the receiving and use of such information and opinions shall not subject any health care organization or other person to any liability or action for money damages or other legal or equitable relief." The information furnished and opinions provided are to be used by the health care organization "in conducting peer review," *id*., which includes "[c]redentialing, privileging or affiliating of health care providers as members of, or providers for, a health care organization," I.C. § 39-1392a(11)(a). The district court reasoned that if a health care

---

[1] The statute states as follows:

> The furnishing of information or provision of opinions to any health care organization or the receiving and use of such information and opinions shall not subject any health care organization or other person to any liability or action for money damages or other legal or equitable relief. Custodians of such records and persons becoming aware of such data and opinions shall not disclose the same except as authorized by rules adopted by the board of medicine or as otherwise authorized by law. Any health care organization may receive such disclosures, subject to an obligation to preserve the confidential privileged character thereof and subject further to the requirement that such requests shall be made and such use shall be limited to aid the health care organization in conducting peer review.

organization has immunity for using information and opinions when making a credentialing decision, then it must also have immunity for the credentialing decision ultimately made. In so holding, the district court erred.

"The interpretation of a statute is a question of law over which we exercise free review." *State v. Thompson*, 140 Idaho 796, 798, 102 P.3d 1115, 1117 (2004). "It must begin with the literal words of the statute; those words must be given their plain, usual, and ordinary meaning; and the statute must be construed as a whole. If the statute is not ambiguous, this Court does not construe it, but simply follows the law as written." *McLean v. Maverik Country Stores, Inc.*, 142 Idaho 810, 813, 135 P.3d 756, 759 (2006). (Citations omitted.)

There is nothing in the wording of the statute that purports to grant immunity to a health care organization for making a credentialing decision. The statute grants immunity for "[t]he furnishing of information or provision of opinions to any health care organization" and for "the receiving and use of such information and opinions." The obvious purpose of the statute is to encourage the free exchange of information and opinions regarding peer review activities, which includes credentialing. A person who provides such information or opinions need not fear a subsequent lawsuit alleging claims such as slander, defamation, tortious interference with contract or prospective economic advantage, or intentional infliction of emotional distress. The statute grants immunity from "*liability or action* for money damages or other legal or equitable relief." I.C. § 39-1392c. (Emphasis added.) The broad grant of immunity may also form a basis for the recovery of attorney fees under Idaho Code § 12-121 and/or Idaho Rule of Civil Procedure 11(a)(1). The health care organization that receives or relies upon such information or opinions is likewise immune from any claim or action for damages or other legal or equitable relief for doing so.

The district court held that immunity for using the information or opinions must also include immunity for the decision ultimately made. Had the legislature so intended, it would have drafted the statute to provide for such immunity. Although the gathering and consideration of information are preliminary steps in making a decision, they are separate from the making of the decision. This is illustrated by the fact that it is common for experts to arrive at conflicting opinions after considering the same information. Holding that Idaho Code § 39-1392c grants immunity for credentialing decisions would be an expansion of that statute beyond its wording. The district court therefore erred in holding that the statute granted such immunity.

6

**B. Did the district court err in holding that Dr. Hartford did not waive any privilege when he presented documents regarding his substance abuse treatment to the Idaho Board of Medicine in connection with a disciplinary hearing?**

Dr. Hartford objected to the disclosure of records relating to his substance abuse treatment that he provided to the Idaho Board of Medicine. He claimed that such records were privileged pursuant to Idaho Rule of Evidence 503(b)(1). That Rule provides:

> A patient has a privilege in a civil action to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of diagnosis or treatment of the patient's physical, mental or emotional condition, including alcohol or drug addiction, among the patient, the patient's physician or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family.

The district court held that such records were privileged under Rule 503(b)(1) and that Dr. Hartford had not waived that privilege by disclosing the information to the Idaho Board of Medicine. Relying upon Idaho Rule of Evidence 510,[2] Harrison contends that the district court erred in holding that Dr. Hartford had not waived the physician privilege provided by Rule 503(b)(1).

Harrison did not name Dr. Hartford as a respondent in the notice of appeal. The notice of appeal was directed to: "THE ABOVE NAMED RESPONDENTS, D. LEE BINNION, M.D. AND SAINT ALPHONSUS REGOINAL MEDICAL CENTER, INC." We long ago held, "Where a notice of appeal is addressed to certain parties, naming them, its legal effect is limited to such parties only." *Williams v. Sherman*, 34 Idaho 63, 66, 199 P. 646, 647 (1921). During oral argument, counsel for Harrison stated that a copy of the notice of appeal was mailed to Dr. Hartford's counsel. The certificate of service on the notice of appeal does not so indicate. Even

---

[2] Idaho Rule of Evidence 510 provides:

> A person upon whom these rules confer a privilege against disclosure of the confidential matter or communication waives the privilege if the person or the person's predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication. This rule does not apply if the disclosure is itself a privileged communication.

if a copy of the notice of appeal was mailed to Dr. Hartford's counsel, we held in *Mahaffey v. Pattee*, 46 Idaho 16, 18, 266 P. 430, 431 (1928), "Where a notice of appeal is directed to one party alone, its service upon another party would not have the effect of bringing such other party before the court."

Dr. Hartford is the one who would have a privilege to prevent the disclosure of confidential communications in his medical records. Because Harrison did not name Dr. Hartford as a respondent, he is not a party to the appeal. This Court cannot decide his rights without him having an opportunity to be heard. Therefore, Harrison has failed to perfect an appeal regarding the issue of whether the district court was correct in holding that Dr. Hartford had not waived his physician privilege. We will not consider that issue.

**C.  Did the District Court Err in Granting Dr. Binnion's Motion for Summary Judgment on the Issue of Causation?**

In an appeal from an order of summary judgment, this Court's standard of review is the same as the standard used by the trial court in ruling on a motion for summary judgment. *Infanger v. City of Salmon*, 137 Idaho 45, 44 P.3d 1100 (2002). All disputed facts are to be construed liberally in favor of the non-moving party, and all reasonable inferences that can be drawn from the record are to be drawn in favor of the non-moving party. *Id*. Summary judgment is appropriate if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Id*. If the evidence reveals no disputed issues of material fact, then only a question of law remains, over which this Court exercises free review. *Id*.

In this case, expert testimony of causation is required. In *Swallow v. Emergency Medicine of Idaho, P.A.* 138 Idaho 589, 597-98, 67 P.3d 68, 76-77 (2003), we held that expert testimony is required unless it is a matter within the usual and ordinary experience of a lay person. We stated as follows:

> We have previously held that a lay person was not qualified to give an opinion about the cause of a medical condition or disease. *Bloching v. Albertson's, Inc.*, 129 Idaho 844, 934 P.2d 17 (1997) (lay person was not qualified to testify that the seizure he suffered immediately after using a blend of pork and beef insulin was caused by the insulin); *Evans v. Twin Falls County,* 118 Idaho 210, 796 P.2d 87 (1990) (husband was not qualified to testify that conduct by

8

sheriff's deputies on April 15, 1987, in grabbing and shaking his wife was a cause of her cardiac arrest and death over eleven months later); *Flowerdew v. Warner,* 90 Idaho 164, 409 P.2d 110 (1965) (patient was not qualified to testify that his injury was caused by physician's treatment). In support of the holding in *Evans v. Twin Falls County,* we quoted from 31A Am. Jur. 2d, *Expert & Opinion Evidence* § 207 as follows:

> Where the subject matter regarding the cause of disease, injury, or death of a person is wholly scientific or so far removed from the usual and ordinary experience of the average person that expert knowledge is essential to the formation of an intelligent opinion, only an expert can competently give opinion evidence as to the cause of death, disease or physical condition.

118 Idaho at 214, 796 P.2d at 91.

Whether a rise in sodium levels in a specified amount over a specified period of time would cause CPM in Harrison is not a matter within the usual and ordinary experience of lay people. Likewise, whether the conduct of Dr. Binnion could be a cause of Harrison's CPM is likewise not a matter within the usual and ordinary experience of lay people. Therefore, Harrison was required to produce expert testimony that Dr. Binnion's conduct was a proximate cause of Harrison's CPM.

Dr. Binnion was Harrison's treating physician from 1:00 a.m. to 3:26 a.m. on November 15, 2003, while he was in the emergency room. During that time, she ordered that he be given an IV saline solution to raise his sodium level. She also called Dr. Hartford to arrange for Harrison to be admitted into the Hospital and wrote the physician's orders for Dr. Hartford so that he would not have to come to the Hospital that night.

The only expert testimony that Dr. Binnion's conduct was a cause of any harm to Harrison came from his expert witness Dr. Navar. He testified that Dr. Binnion's alleged malpractice was: (1) her failure to communicate to Dr. Hartford the seriousness of Harrison's condition; (2) her failure to include in her orders appropriate instructions to the nurses that they immediately tell the treating physician, Dr. Hartford, all of Harrison's laboratory sodium values; and (3) her failure to admit Harrison to ICU.[3] He also testified that in his opinion each of these instances of negligence was a cause of Harrison's CPM.

---

[3] Dr. Navar testified during his deposition as follows:

Q    It says: "Mr. Rossman, I'm comfortable with the following statements. Please contact me if you have any questions."

9

Proximate cause contains two components: actual cause, which is a factual question of whether a person's conduct produced a particular harm, and legal cause, which is a legal question of whether legal liability attaches to the conduct. *Newberry v. Martens*, 142 Idaho 284, 288, 127 P.3d 187, 191 (2005). Where an expert testifies regarding the factual basis for his or her opinion regarding causation, we will examine those facts to see if they support the opinion. Each of Dr. Navar's allegations of negligence by Dr. Binnion will be discussed separately.

**1. Dr. Binnion's alleged failure to communicate to Dr. Hartford the seriousness of Harrison's condition.** Dr. Binnion first saw Harrison at about 1:00 a.m. on November 15, 2003. At about 2:25 a.m., she telephoned Dr. Hartford, who was the on-call physician for Harrison's treating physician. Dr. Hartford agreed to admit Harrison into the hospital, but Dr. Hartford did not come into the hospital to see Harrison until about 11:00 a.m. Dr. Navar thought that if Dr. Binnion had given Dr. Hartford more information when they talked on the telephone, then Dr. Hartford would have seen Harrison sooner than 11:00 a.m.[4] For Dr. Binnion to be liable for this

---

"Number one, Mr. Harrison visited the ER department with, among other diagnoses, a condition of profound chronic hyponatremia.

"Number two, Dr. Binnion breached the local standard of care by failing to fully and completely communicate Mr. Harrison's history, physical exam, symptoms and test results to Dr. Hartford prior to the admission of Mr. Harrison to the orthopedic floor of the hospital.

"Number three, Dr. Binnion breached the local standard of care by failing to communicate within her physician's orders at the time they were written, her concerns about rapid elevation of sodium, and that all laboratory sodium values be immediately communicated to the attending physician upon receipt by attending nursing staff.

"Number four, Dr. Binnion breached the prevailing local standard of care by admitting Mr. Harrison to the orthopedic floor of the hospital rather than the ICU.

"Number 5, Dr. Binnion's breach of the prevailing local standard of care as identified above was a substantial factor in causing the condition of Central Pontine Myelinolysis in Mr. Harrison."

MS. OLSSON: You can read it from the exhibit.
MR. ROSSMAN: Central Pontine Myelinolysis.
BY MS. OLSSON:
Q        Are those your opinions, Doctor?
A        They are.
Q        Do you have any other opinions in this case?
A        No.

[4] Dr. Navar testified in his deposition:

THE WITNESS: One of my criticisms is that it's my opinion that Dr. Binnion did not give a full – did not reveal the acuity of the situation in her deposition. I couldn't find that she actually gave Dr. Hartford the actual sodium results.

She did mention he had hyponatremia, and my concern would be that Dr. Hartford, you know, not being present to see Mr. Harrison, may not have been aware of the acuity of the situation and the necessity for him to report to the hospital for Mr. Harrison's evaluation right away.

alleged negligence, there must be expert testimony supporting a conclusion that Dr. Hartford's failure to see Harrison prior to 11:00 a.m. was a cause of Harrison's CPM.

Dr. Binnion was responsible for Harrison's care from 1:00 a.m. to 3:26 a.m. on November 15, 2003. During that period, she ordered that Harrison be given IV sodium at the rate of 200 cc's per hour, which was started at 1:50 a.m. She also wrote the physician orders for Dr. Hartford that were in effect from 3:26 a.m. until 11:00 a.m. when Dr. Hartford saw Harrison in the Hospital.[5] Those physician orders also directed that Harrison be given IV sodium at the rate of 200 cc's per hour.

Harrison's first lab results on November 15, 2003, showed a sodium level of 96 mEq/L at 12:49 a.m., a life threateningly low level of sodium. After reviewing those lab results at 1:00 a.m., Dr. Binnion began sodium replacement by ordering that Harrison have a saline IV at the rate of 200 cc's per hour. The second lab results at 6:00 a.m. showed that Harrison's sodium level had increased to 105 mEq/L. According to Dr. Navar, at that point the rate of sodium replacement should have been slowed significantly or stopped. Dr. Hartford did not become aware of the 6:00 a.m. lab results until he examined Harrison at 11:00 a.m. Thus, there was evidence supporting Dr. Binnion's liability if that five-hour delay in Dr. Hartford learning of the 6:00 a.m. lab results was a cause of any harm to Harrison. There was no factual basis for concluding that it was.

First, after Dr. Hartford examined Harrison and reviewed the medical records showing the 9 mEq/L increase in Harrison's sodium levels from 12:49 a.m. to 6:00 a.m., Dr. Hartford decided to give Harrison IV saline at 200 cc's per hour. He testified that in his opinion he could not slow the rate of sodium replacement because of Harrison's vomiting, dehydration, and hypokalemia. In fact, Dr. Hartford did not alter the rate of sodium replacement until 10:00 a.m. on November 16, 2003, when he stopped the saline IV. There is no evidence that Dr. Hartford would have done anything different had he come into the hospital and seen Harrison earlier.

Second, assuming that Dr. Hartford would have altered the rate of sodium replacement had he been at the hospital at 6:00 a.m. rather than at 11:00 a.m., there was no evidence that the failure to alter the rate of sodium replacement between 6:00 a.m. and 11:00 a.m. was a cause of

---

[5] The record does not reflect whether Dr. Hartford dictated what Dr. Binnion was to write for his physician orders or whether she used her own discretion. We therefore assume she used her own discretion in writing the orders for Dr. Hartford.

any harm to Harrison. During the period from 12:49 a.m. to 12:27 p.m., Harrison's sodium level increased from 96 mEq/L to 110 mEq/L, an increase of 14 mEq/L during a twelve-hour period. Although that rate of increase would support a finding of negligence, in order for Dr. Binnion to be liable there must also be evidence that her negligence was a proximate cause of harm to Harrison. He did not produce any expert testimony supporting a finding that it was.

Dr. Navar testified that he did not know whether the 14 mEq/L increase in Harrison's sodium level during that initial 12-hour period was a cause of harm to Harrison. Dr. Navar's deposition testimony on this issue was as follows:

> A    I don't know whether that initial increase from 96 to 110 over a 12-hour period would have been enough to result in the insult just by itself.
> Q    And that was 14 milliequivalents in approximately a 12-hour period of time?
> A    Right.
> Q    Okay. How about the 9 milliequivalent increase in the approximate six-hour period of time from 0049 to 6 a.m., would that in and of itself have been enough to cause CPM in Mr. Harrison?
> A    I don't know.

Dr. Binnion started Harrison's sodium replacement when he was in the ER. Once Harrison was admitted into the Hospital, Dr. Binnion no longer had any responsibility for his care. Dr. Hartford became Harrison's treating physician. It was his obligation to monitor the change in Harrison's sodium levels and to adjust the rate of sodium replacement accordingly. This is not a situation in which Dr. Binnion began a negligent course of treatment that continued because Dr. Hartford negligently failed to detect it. Dr. Navar twice testified that he had no criticism of Dr. Binnion for ordering the saline IV's that Harrison received in the ER.

Dr. Binnion also wrote the initial physician's orders for Dr. Hartford, and those orders remained in effect until he wrote his own after examining Harrison at 11:00 a.m. In those initial physician's orders, Dr. Binnion wrote that Harrison was to be given IV sodium at the rate of 200 cc's per hour. There was no testimony, however, that she was negligent for doing so.

There was one statement by Dr. Navar that could be interpreted as being critical of Dr. Binnion's treatment while Harrison was in the ER. After testifying that he was not critical of Dr. Binnion for ordering the IV saline in the ER to begin sodium replacement, Dr. Navar stated that

Dr. Binnion should have slowed the rate of administration significantly after receiving the lab test results showing a sodium level of 96 mEq/L. His testimony was as follows:

> A    But at the time that the sodium value became available again, at that point, I would think that the sodium level or the rate of administration of fluid would need to be closely monitored from that standpoint. It probably should have been slowed down significantly from the time that it was -- and I guess that's not listed in this opinion.
> Q    When did you form that opinion, that the rate of administration should have been slowed down?
> A    I've had that opinion from the beginning.
> Q    When should the administration of normal saline have been slowed down?
> A    When Dr. Binnion got the lab report back that the sodium level was 96.

It is obvious that Dr. Navar misspoke when stating that Dr. Binnion should have slowed the rate of sodium replacement after receiving the lab results showing a sodium level of 96 mEq/L. Dr. Navar began by saying that "at the time that the sodium value became available *again*." (Emphasis added.) The use of the word "again" indicates that he thought there had been a prior lab test showing an earlier sodium level. There had not been. The 96 mEq/L sodium level was from the first lab test. It was the results of the second lab that showed an increase in Harrison's sodium level. Dr. Navar also stated that when the lab report showing the 96 mEq/L sodium level was received, the rate of administration of fluid should have been "*slowed down significantly*." (Emphasis added.) At the time Dr. Binnion saw the lab results showing a sodium level of 96 mEq/L, the saline infusion had not even been started. She did not order the saline IV until after receiving those lab results. It is apparent that Dr. Navar misspoke and was referring to the second lab results that showed an increase in Harrison's sodium level to 105 mEq/L. Both before and after making the statement quoted above, Dr. Navar testified that he was not critical of Dr. Binnion for the saline IV's she ordered while Harrison was in the ER.[6]

---

[6] Before testifying that the rate of administration of fluid should have been slowed down significantly when the lab results were again available showing a sodium level of 96 mEq/L, Dr. Navar testified as follows:

> Q    Okay. Do you have criticism, Doctor, of Dr. Binnion's treatment, actual treatment of the sodium replacement for Mr. Harrison while he was in the emergency department at St. Alphonsus Hospital?
> A    No, I don't specifically. I – Dr. Binnion was not aware of the sodium level until sometime in the latter portion of his visit, so I don't have a specific criticism regarding the fact that he was given some fluid boluses in the emergency department.

Even accepting Dr. Navar's testimony at face value that Dr. Binnion should have slowed the rate of saline replacement that she had not yet begun after what were the first lab results were again available, there was no testimony that her failure to do so was a cause of any harm to Harrison. As pointed out above, Harrison did not produce any expert testimony stating that the rate of sodium replacement during the first twelve hours was a cause of any harm to him. He also did not produce any expert testimony stating that the increase in Harrison's sodium level during the first twelve hour period combined with the subsequent increases while under Dr. Hartford's care caused Harrison's CPM.

There is no evidence supporting Dr. Navar's opinion that Dr. Binnion's alleged negligence in failing to give Dr. Hartford more details so he would come to the hospital sooner than he did was a cause of any harm to Harrison. The district court did not err in dismissing this claim of alleged negligence.

**2. Dr. Binnion's failure to include in her orders appropriate instructions to the nurses that they immediately tell Dr. Hartford all of Harrison's laboratory sodium values.** Dr. Navar also testified that in his opinion Dr. Binnion was negligent for failing to include in the physician's orders a direction to the nurses to immediately tell Dr. Hartford of Harrison's laboratory sodium values and that such negligence was a cause of Harrison's CPM. The physician's orders written by Dr. Binnion were in effect from 3:26 a.m. until 11:00 a.m., when Dr. Hartford examined Harrison and wrote his own physician's orders. The only lab results received during that period of time were those obtained at 6:00 a.m. Had Dr. Binnion done as Dr. Navar suggests, Dr. Hartford would have learned of those lab results at around 6:00 a.m. rather than at 11:00 a.m. For the reasons stated above regarding the alleged negligence in not

---

After testifying that the rate of saline replacement should have been slowed after receipt of the lab results showing a sodium level of 96 mEq/L, Dr. Navar testified as follows:

> Q      Okay. So you have no criticism of the normal saline boluses; right?
> A      No.

A "bolus" is "**a:** a dose of a substance (as a drug) given intravenously **b:** a large dose of a substance given by injection for the purpose of rapidly achieving the needed therapeutic concentration in the bloodstream." *Merriam-Webster Online Dictionary* (visited March 23, 2009) <http://www.merriam-webster.com/dictionary/bolus>

making Dr. Hartford aware of the need to come into the hospital as soon as possible to see Harrison, there is no evidence that Dr. Hartford's failure to learn of the 6:00 a.m. lab results earlier was a cause of any harm to Harrison. Thus, there is no evidence supporting Dr. Navar's opinion that the Dr. Binnion's failure to order the nurses to immediately advise Dr. Hartford of the lab results was a cause of any harm to Harrison. The district court did not err in dismissing this claim of alleged negligence.

**3. Dr. Binnion's failure to admit Harrison to the ICU.** Dr. Navar testified that Dr. Binnion was negligent for not admitting Harrison to the ICU, where he would have had blood draws more frequently than every six hours to more closely monitor his sodium levels. It is uncontradicted that Dr. Binnion did not have authority either to admit Harrison to the Hospital or to decide whether he would be admitted to ICU rather than to some other part of the Hospital. Where Dr. Binnion did not have any authority to admit Harrison to the Hospital, her alleged failure to admit him to the ICU in the Hospital cannot legally be a proximate cause of his CPM. She cannot be held liable for failing to do something she had no authority to do. The district court did not err in dismissing this claim of alleged negligence.

## D. Is Dr. Binnion Entitled to an Award of Attorney Fees on Appeal Pursuant to Idaho Code § 12-121?

Dr. Binnion seeks an award of attorney fees under Idaho Code § 12-121. That statute authorizes an award of attorney fees on appeal to Dr. Binnion, as the prevailing party, if Harrison brought or pursued the appeal frivolously, unreasonably, or without foundation. *Nampa & Meridian Irr. Dist. v. Mussell*, 139 Idaho 28, 37, 72 P.3d 868, 877 (2003). We do not find that Harrison brought or pursued the appeal against Dr. Binnion frivolously, unreasonably, or without foundation. We therefore decline to award attorney fees under Idaho Code § 12-121.

## IV. CONCLUSION

We vacate the judgment dismissing this action as to the Saint Alphonsus Regional Medical Center, Inc., (Hospital) and remand this case for further proceedings against it consistent with this opinion. We award Harrison costs on appeal against the Hospital. We affirm the judgment dismissing this action against Dr. Binnion and award her costs on appeal against Harrison.

15

Justices BURDICK and J. JONES **CONCUR.**

W. JONES, Justice,

I respectfully dissent as to part III C of the majority opinion. I agree with the majority in so much as Harrison was required to produce expert testimony on the issue of whether Dr. Binnion was the proximate cause of Harrison's resulting CPM. However, I would hold that Harrison effectively met his burden at the summary judgment phase; therefore, I would reverse the district court's decision and remand this case for further proceedings. For purposes of summary judgment Harrison was only required to show that a genuine issue of material fact existed as to whether Dr. Binnion's alleged negligence was a substantial factor in causing Harrison's resulting CPM. I take issue with the majority requiring a higher standard of proof than what our current case law dictates.

Proximate cause consists of actual cause and true proximate cause. *Newberry v. Martens*, 142 Idaho 284, 288, 127 P.3d 187, 191 (2005). Actual cause determines whether the actor's conduct produced the harm and true proximate cause, or legal cause, determines whether liability for that conduct should attach. *Id.* "Actual cause is the factual question of whether a particular event produced a particular consequence." *Id.* "If reasonable people might reach a different conclusion from conflicting inferences based on the evidence then the [summary judgment] motion must be denied." *Cramer v. Slater*, 146 Idaho 868, ___, 204 P.3d 508, 513 (2009). In Idaho, the standard for applying proximate cause in medical malpractice actions containing multiple causes is the "substantial factor" test. *Fussell v. St. Clair*, 120 Idaho 591, 602, 818 P.2d 295, 306 (1991). "By making the 'substantial factor' test the standard for all proximate cause instructions [in multiple cause medical malpractice actions] [and] by removing the 'but for' test we will have simplified proximate cause by eliminating the unnecessary search for single or multiple causes[.]" *Id.* The Restatement (Second) of Torts § 431 (1965)[7] states that an "actor's negligent conduct is a legal cause of harm to another if [] his conduct is a substantial factor in bringing about the harm[.]"

---

[7] Impliedly adopted by this Court in *Fussell*, 120 Idaho at 602, 818 P.2d at 306. See also *Challis Irr. Co. v. State*, 107 Idaho 338, 689, P.2d 230 (Ct. App. 1984); *Crosby v. Rowand Machinery Co.*, 111 Idaho 939, 729 P.2d 414 (Ct. App. 1986); *Edmark Motors v. Twin Cities Toyota, Inc.*, 111 Idaho 846, 727 P.2d 1274 (Ct. App. 1987).

The following considerations are in themselves or in combination with one another important in determining whether the actor's conduct is a substantial factor in bringing about harm to another:

> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;

> (b) whether the actor's conduct has *created a force or series of forces which are in continuous and active operation* up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;

> (c) lapse of time.

Restatement (Second) of Torts § 433 (1965) (emphasis added). As to subsection (b) of § 433 the comments reference the following:

> If the effects of the actor's negligent conduct *actively and continuously operate to bring about harm* to another, the fact that the active and substantially simultaneous operation of the effects of a third person's . . . tortious . . . act is also a substantial factor in bringing about the harm does not protect the actor from liability.

Restatement (Second) of Torts § 439 (1965) (emphasis added);[8] *see also* Restatement (Second) of Torts § 433 cmt. e.

> Where the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, *the fact that the harm is brought about through the intervention of another force does not relieve*

---

[8] Although in the great majority of cases to which the rule stated in this Section is applicable, the effects of the conduct of both the actor and the third person are in simultaneous active operation, it is not necessary that their operations shall be absolutely simultaneous. It is enough that the two are in substantially simultaneous operation, as when the effect of the conduct of one or the other has ceased its active operation immediately before the other's conduct takes active effect in harm to the other. Restatement (Second) of Torts § 439 cmt a.

*the actor of liability*, except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct.

Restatement (Second) of Torts § 442B (1965) (emphasis added).

In the present case, regardless whether it was alleged that Dr. Hartford committed greater acts of negligence than Dr. Binnion, Dr. Binnion's actions must be evaluated solely on whether her negligence was sufficient, when paired with any foreseeable subsequent negligence, to substantially contribute to the final outcome. Therefore, Dr. Binnion's alleged negligence must be evaluated in light of Harrison's ultimate injury and not solely with respect to any subsequent actions on the part of Dr. Hartford. Other jurisdictions have looked at multiple causation injuries and evaluated whether the "actor's negligent conduct *actively and continuously operate to bring about harm* to another[.]" *See* Restatement (Second) of Torts § 439; *Osborn v. Irwin Mem'l Blood Bank*, 7 Cal. Rptr. 2d 101 (Cal. Dist. Ct. App. 1992) (finding that § 439 is applicable because "[a] 'continuous' chain of cause and effect is manifest [where] [a boy] received blood from [the blood bank's] donor pool because [the blood bank] misrepresented that directed donations were not available; and [the boy] contracted AIDS because [the] blood was contaminated, just as his parents feared it would be"); *Schnebly v. St. Joseph Mercy Hosp. of Dubuque*, 217 N.W.2d 708, 730-31 (Iowa 1974) (*overruled on other grounds*) (finding the laboratory's negligence in reporting blood results set the stage for the subsequent negligence of the Doctor's reliance on those results despite other conflicting results and therefore, the Doctor's negligence was not a superseding cause to the laboratory's liability); *Rudeck v. Wright*, 709 P.2d 621, 627 (Mont. 1985) (holding that a doctor is not relieved from liability for his negligent act of leaving a lap mat in patient following surgery because his negligence "actively and continuously act[ed] to cause harm to his patient" along with the "active and substantially simultaneous negligent act of the nurses" in failing to account for the lap mat); *Wilson v. Brister*, 982 S.W.2d 42, 45 (Tex. App. 1998) (finding summary judgment inappropriate where evidence supported the contention that physician was a concurring cause of patient's suicide despite the negligence of the friend that gave patient the gun and bullets).

In the present case, for the purposes of summary judgment only, it was assumed that Dr. Binnion breached the local standard of care in the following areas:

1. Dr. Binnion failed to fully and completely communicate Harrison's history, physical exam, symptoms and test results to Dr. Hartford prior to Harrison's admission to the orthopedic floor.
2. Dr. Binnion failed to communicate within her physician's orders at the time they were written[] her concerns about rapid elevation of sodium[] and that all laboratory values be immediately communicated to Dr. Hartford upon receipt.
3. Dr. Binnion violated the local standard of care by "admitting" Harrison to the orthopedic floor rather than the Intensive Care Unit (even though he also testified she had no admitting privileges), and
4. Dr. Binnion failed to slow the rate [at which] Harrison's sodium levels were corrected.

Thus, the inquiry of this Court on review is whether there exists a genuine issue of material fact as to whether any of the presumed breaches was a substantial factor in bringing about Harrison's CPM.[9]

In his deposition Dr. Navar states that in his opinion Dr. Binnion's breach of the local standard of care was a substantial factor in causing the condition of CPM in Harrison. The district court's opinion states that plaintiff "failed to produce admissible expert testimony that, to a reasonable degree of medical certainty, Dr. Binnion caused Harrison's CPM by failing to slow the correction of his sodium levels before 3:25 a.m. when her care transferred to Dr. Hartford."

---

[9] The following are cases citing Restatement (Second) of Torts § 431 and discussing whether alleged negligence was the proximate cause of the injury pursuant to the substantial factor test. *Daniels v. Hadley Mem'l Hosp.*, 566 F.ed 749, 760 (D.C. Cir. 1977) (finding that a hospital's failure to administer forced oxygen to patient in aniphilactic shock was a substantial factor leading to his death not because it decreased circulation and distribution of sus-phrine injection, but because patient's lack of respiration lead to cardiac arrest and neurological death); *Duarte v. Zachariah*, 28 Cal. Rprt.2d 88, 91 (Cal. Dist. Ct. App. 1994) (holding that injury to bone marrow allegedly caused by an over-prescription of medication is actionable regardless whether plaintiff can show that it caused reoccurrence of plaintiff's cancer); *Kaiser Found. Health Plan v. Sharp*, 741 P.2d 714, 720 (Colo. 1987) (finding a triable issue of fact exists even if the doctor "could not say 'in terms of probability' whether hospitalization would have stabilized [plaintiff's] condition" because "[t]he plaintiffs were not required to prove their case before the trial court on a motion for summary judgment"); *Kastler v. Iowa Methodist Hosp.*, 193 N.W. 2d 98, 103 (Iowa 1971) (finding that the defendant hospital was a substantial factor in bringing about plaintiff patient's injury by allowing patient with known fainting spells to shower unsupervised); *NKC Hosp., Inc. v. Anthony*, 849 S.W.2d 564, 565-68 (Ky. Ct. App. 1993) (the hospital's negligence in prematurely discharging pregnant patient suffering from an undiagnosed perforated appendix was a substantial factor in causing her death and not excused by the treating physician's failure to timely diagnose and treat the condition).

The district court and the majority rely on the following testimony of Dr. Navar to support this contention:

A: I don't know whether the initial increase from 96 to 110 over a 12-hour period *would have been enough to result in the insult just by itself*.

. . .

Q: Okay. How about the 9 milliequivalent increase in the approximate six-hour period of time from 0049 to 6 a.m., *would that in and of itself have been enough* to cause CPM in Mr. Harrison?

A: I don't know.

(emphasis added). It is clear from the language "just by itself" and "in and of itself" that this portion of Dr. Navar's deposition addressed whether but-for Dr. Binnion's presumed negligence the injury to Harrison would not have occurred. This inquiry misses the point. The important question is: whether Dr. Binnion's presumed negligence was a substantial factor in contributing to Harrison's injury, not whether it was the sole cause. Dr. Navar specifically addressed this question stating in his opinion that "Dr. Binnion's breach of the prevailing local standard of care as identified above was a substantial factor in causing the condition of [CPM] in Mr. Harrison."

The majority takes issue with the fact that Dr. Navar's testimony is not supported sufficiently with evidence in the record. However, it was not sufficiently contested either. The only testimony regarding the cause of Harrison's CPM addressed whether Dr. Binnion's actions were sufficient standing alone. As previously stated, the evidence should have addressed whether Dr. Binnion's actions were a substantial factor in causing the injury rather than the sole cause.

Further, Dr. Laureno stated that he would be able to provide the following opinions at trial and that these opinions were developed to a reasonable degree of medical certainty:[10]

6. The rapid elevation of sodium was a substantial factor in causing the condition of CPM, resulting in "Locked-in Syndrome" and neurological injury.

7. Had Mr. Harrison's sodium been raised at a reasonably conservative rate, more likely than not, Mr. Harrison would not have suffered from the condition of CPM.

20

8. The rapid elevation of sodium, and resulting CPM, were substantial factors in requiring further hospitalization, care, treatment and medical expenses to Mr. Harrison.

This Court recently adopted the Restatement (Second) of Torts § 457 (1965) which "generally applies to any subsequent medical negligence which is necessary to correct an original act of medical negligence, thereby making acts of subsequent medical negligence generally foreseeable." *Cramer* at ___, 204 P.3d at 514. We also held that concurring acts of negligence would then be analyzed and weighted by the jury pursuant to Idaho's comparative fault statute. *Id.*; *See also* I.C. § 6-801.

In *Manning,* this Court held that a "substantial factor" instruction was properly given to the jury in a multiple cause medical malpractice action.[11] *Manning v. Twin Falls Clinic & Hosp., Inc.*, 122 Idaho 47, 51, 830 P.2d 1185, 1189 (1992). On April 17, 1987, Daryl Manning was admitted for the final time to the Twin Falls Clinic & Hospital. *Id.* at 49, 830 P.2d at 1187. His chronic obstructive pulmonary disease (COPD) with marked hypoxemia and increased $CO_2$ retention had deteriorated to the point where "his death was imminent." *Id.* On April 20, Daryl's physician informed the family that he had 24 hours to live; an arterial blood gas test was taken which confirmed that his "condition had deteriorated to a point nearly incompatible with the sustaining of life." *Id.* at 49-50, 830 P.2d at 1187-88. Immediately following the arterial blood gas test, but prior to the results, the nursing staff temporarily disconnected Daryl's supplemental oxygen in order to move him to a private room. *Id.* at 49, 830 P.2d at 1187. Daryl had been moved less than fifteen feet from his bed when he suffered from extreme respiratory distress; he died shortly thereafter. *Id.* at 50, 830 P.2d at 1188. Despite the imminence of his death, the jury concluded, and this Court affirmed, that the nurses who moved Daryl without the use of supplemental oxygen were a proximate cause of Daryl's death under the substantial factor test. *Id.* at 51, 830 P.2d at 1189. The *Manning* decision is similar to this case in that the question

---

[10] Dr. Laureno testified at deposition that opinion nos. 6, 7, and 8 were accurate statements of his opinions.

[11] The instruction read: "[w]hen I use the expression 'proximate cause,' I mean a cause which, in natural or probable sequence, produced the complained injury, loss or damage. It need not be the only cause. It is sufficient if it is a substantial factor in bringing about the injury, loss or damage." *Manning*, 122 Idaho at 51, 830 P.2d at 1189.

posed to the jury is not whether the removal of Daryl's oxygen was the sole cause of his death, but rather whether it substantially contributed to his death.

Similarly, the question here should be posed as to whether Dr. Binnion's negligence substantially caused Harrison's resulting CPM, not whether Dr. Binnion was the sole cause. It is then for the jury to apportion fault among all the allegedly negligent actors. As in *Cramer*, the alleged negligence in this case of Dr. Binnion should be compared to the alleged negligence of Dr. Hartford pursuant to Idaho's comparative fault statute. *See* I.C. § 6-801.

There is no doubt that the evidence in the record is conflicting. However, it is improper for this Court or the district court to weigh that conflicting evidence once the plaintiff sufficiently rebuts the defendant's contention that no genuine issue of material fact exists. I find the expert testimony of Dr. Navar sufficient to create a genuine issue of material fact as to whether Dr. Binnion, the initiator in this unfortunate stream of events, was a substantial factor in causing Harrison's CPM. It may well be that the evidence is weak compared to the competing evidence, but the weight of the evidence is not the issue at the summary judgment stage. There is at least a triable issue of fact as to causation that should survive summary dismissal.


HORTON, J., dissenting in part.

I join in the Court's decision except for Part III(A), from which I respectfully dissent. I am unable to conclude that the district court erred by denying Plaintiffs' motion to amend their complaint to add a claim against the Hospital for negligent credentialing by granting hospital privileges to Dr. Hartford.

Setting aside the pivotal question whether I.C. § 39-1392c affords the Hospital immunity from a claim of negligent credentialing, it is evident that the district court applied the appropriate legal standards governing the motion to amend. The district court correctly observed that the decision whether to grant Plaintiffs leave to amend their complaint was a matter committed to its discretion. *See e.g. Youngblood v. Higbee,* 145 Idaho 665, 667, 182 P.3d 1199, 1201 (2008) (citing *Hines v. Hines,* 129 Idaho 847, 853, 934 P.2d 20, 26 (1997)). The district court also correctly noted that I.R.C.P. 15(a) provides that such "leave shall be freely given when justice so requires." Finally, the district court properly recognized that in reaching its decision whether to grant leave to amend, it was appropriate to consider whether the amended pleading set forth a valid claim. *See e.g. Spur Products Corp. v. Stoel Rives LLP,* 142 Idaho 41, 44, 122 P.3d 300,

22

303 (2005) (citing *Black Canyon Racquetball Club, Inc. v. Idaho First Nat'l Bank, N.A.,* 119 Idaho 171, 175, 804 P.2d 900, 904 (1991)).

Turning to the question whether I.C. § 39-1392c provides immunity to the Hospital for its credentialing decision, the district court found the statute to be unambiguous. The district court then summarized its analysis as follows:

> The Harrisons' logic would place this Court in the untenable position of granting St. Alphonsus immunity for reading the material but simultaneously holding St. Alphonsus liable for using the contents read by the committee in the material when granting or denying credentials. As St. Alphonsus contends, the act of issuing the credential is *the ultimate use of credentialing material*.

(emphasis original).

I agree with the district court's conclusion. The statute in question, I.C. § 39-1392c, provides as follows:

> The furnishing of information or provision of opinions to any health care organization or the receiving and use of such information and opinions shall not subject any health care organization or other person to any liability or action for money damages or other legal or equitable relief. Custodians of such records and persons becoming aware of such data and opinions shall not disclose the same except as authorized by rules adopted by the board of medicine or as otherwise authorized by law. Any health care organization may receive such disclosures, subject to an obligation to preserve the confidential privileged character thereof and subject further to the requirement that such requests shall be made and such use shall be limited to aid the health care organization in conducting peer review.

The first sentence defines a broad grant of immunity for both "[t]he furnishing of information or provision of opinions to any health care organization" and "the receiving and use of such information and opinions." This begs the question: What is the intended scope of conduct for which immunity is granted? I believe that the final sentence of the statute answers this question: "Such use shall be limited to aid the health care organization in conducting peer review."

In my view, in addition to providing for the confidentiality of peer review materials, *see* I.C. § 39-1392b, by its adoption of I.C. § 39-1392c, the legislature expressly and unambiguously

23

provided a broad grant of immunity for peer review activities conducted by health care organizations. This grant of immunity is extended beyond those who simply provide information; rather, the grant of immunity is extended to those who act on peer review information. The statutory definition of "peer review" activities by a health care organization expressly includes credentialing decisions. I.C. § 39-1392a(11)(a). The Hospital clearly is a "health care organization" as defined by I.C. § 39-1392a(3). As the legislature has unambiguously provided that a credentialing decision is a peer review activity, I would affirm the district court's decision denying Plaintiffs' motion to amend.